IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DANN MARINE TOWING, LC   *

    Plaintiff   *

     vs.   *   CIVIL ACTION NO. MJG-12-1610

GENERAL SHIP REPAIR CORP.   *

    Defendant   *

\*   \*   \*   \*   \*   \*   \*   \*   \*

<u>MEMORANDUM OF DECISION</u>

The Court has conducted the bench trial of Plaintiff Dann Marine Towing, LC's ("Dann Marine") claims against Defendant General Ship Repair Corp. ("GSR"). The Court has heard the evidence presented, reviewed the exhibits, considered the materials submitted by the parties, and had the benefit of the arguments of counsel. The Court now issues this Memorandum of Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.[1]

---

[1] "In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58." Fed. R. Civ. P. 52(a)(1).

The Court finds the facts stated herein based upon its evaluation of the evidence, including the credibility of witnesses, and the inferences that the Court has found reasonable to draw from the evidence.

I.   BACKGROUND

In October 2011, the IVORY COAST, a Dann Marine tugboat, caught fire and was seriously damaged while being repaired by GSR.  In this lawsuit, Dann Marine sues GSR for damages caused by the fire.  As discussed herein, the Court finds neither side totally free of fault for the fire and neither side's contentions to be totally correct.

Since the late 1960s, Dann Marine, a Maryland corporation based in Chesapeake City, Maryland, has been engaged in providing marine tug and towing services on the Chesapeake Bay and other waters along the United States East Coast, as well as in such locations as the Great Lakes, the Gulf Coast of Mexico, the Caribbean, and South America.  Dann Marine owns a fleet of tugboats, one of which, built in 1967, is the IVORY COAST ("the Boat").

Since the 1920s, GSR has been a Maryland corporation, based in Baltimore, Maryland, that provides ship repair services.

Dann Marine and GSR had a business relationship beginning about 10-15 years ago, under which GSR regularly provided repairs to Dann Marine's boats.

A. Repair Agreement

In September 2011, Dann Marine's Boat was active in service transporting coal for a local utility, earning $4,900 per day. Dann Marine decided to schedule needed repairs to the Boat. Robert Dann, the Dann Marine port engineer and a part owner of the company, contacted Derick Lynch[2] of GSR and verbally described the work wanted. Derick Lynch arranged for the GSR yard manager to survey the items to be repaired on the Boat. A proposal [Def.'s Ex. 1][3] was prepared on September 30, 2011 and sent to Robert Dann to review. Robert Dann responded with a request that Dann Marine handle certain service items itself rather than pay GSR. For example, Dann Marine indicated it would

_____

[2]    Charles Frederick Lynch, Jr., commonly known as Derick, is the President of GSR.

[3]    Based on the parties' prior custom and practice, the proposal includes terms and conditions that form part of the final contract. The proposal states on the first page: "IMPORTANT TERMS AND CONDITIONS: Work will be performed by us only upon the terms and conditions set forth on the reverse of this invoice/proposal which shall be deemed to have been accepted by the customer upon arrival of the vessel at our yard, or upon commencement of marine or non-marine work by us at any location." Proposal, Def.'s Ex. 1.

provide the marine chemist certificate and supply its own power

by generator rather than use GSR's shore power.  The contract

was finalized in the form of a "yard specification" with a job

number and was dated October 5, 2011.  See Def.'s Ex. 1.

Provision number 8 on the second page of the yard

specification describes the work to be done to remove and

replace some of the steel along the starboard engine side of the

Boat.[4]  Id.  This required preparation of the Boat prior to

commencing hot work,[5] including cleaning the Boat's bilge and a

marine chemist's certification that the boat was safe for hot

work.  The agreement provided that Dann Marine was to engage

---

[4]    The wording in the proposal and the yard specification was
identical: "Furnish labor, material, and equipment to crop and
renew the upper shear strake form the main deck edge 12" down
the side shell in way of the engine room for twenty-three (23)
frame spaces[about 46 linear feet]. Make necessary removals for
access from engine room side.  Flush off all old steel including
the split pipe fender.  Preblast and prime 35 L.F. of 1/2" x 12"
F.B.  Fit up the 12" F.B. from approximately 6" aft of fwd
engine room bulkhead to 6" fwd of the aft bulkhead.  Provide all
necessary fire watch during all hot work.  Hose test to prove
tight.  Power tool clean all new and disturbed areas.  Apply all
coatings as original.  Remove split pipe fwd, part of engine
room to aft end of engine room.  Fit and weld a blank over split
pipe to cap same."  Def.'s Ex. 1.
[5]    The term "hot work" is used to describe welding, cutting,
burning, or other repair work that creates sparks and carries a
risk of fire from ignition of flammable or combustible materials
in the space or from leaks of flammable gas from the hot work
equipment into the space. 29 C.F.R. § 1915.4, 11.

independent cleaners and a marine chemist to certify the Boat
safe for hot work.

B.   Start of Repairs

On or about October 6, 2010, Dann Marine brought the Boat
to GSR's facility in Baltimore, Maryland to have the repairs
performed.  Randy Ash ("Ash"), the Boat's Chief Engineer, and a
Dann Marine deckhand, Nick Jones ("Jones") remained aboard when
the Boat was left at GSR.

In accordance with the parties' agreement, Dann Marine
contracted with A2Z Environmental Group ("A2Z") to clean the
Boat's bilge in preparation for the hot work.  One of Dann
Marine's port engineers, Jack Collins ("Collins"), was directed
to oversee that the cleaning was done to the marine chemist's
satisfaction and to get the hot work certificate.

Collins does not recall who contacted A2Z or the particular
instructions given A2Z. However, A2Z field supervisor, Frank
Merritt, testified that he was instructed by Collins "[t]o clean
from the centerline of the boat to the starboard side to have it
available for hot work." Tr.[6] 3, 157:20-21, 160:13-16.  Collins

_____

[6]    All Tr. references herein refer to the transcripts from the
five-day bench trial held June 20-24, 2016, and closing

5

did not arrive at the Boat until the A2Z cleaning was almost complete.  See Tr. 3, 30:21-25.

A2Z spent about eleven hours[7] cleaning the Boat's two diesel fuel tanks and pressure washing the bilge.  The starboard and port sides of the bilge are connected at the centerline.  A2Z removed the deck plates and removed all the liquid from the lowest point of the bilge.[8]  It then performed a more detailed and thorough cleaning of the starboard side by scraping, bagging any solid residue (such as rags, bottle caps, debris), degreasing, pressure-washing, and finally, vacuuming up the liquids again from the lowest point of the bilge.  A2Z did not perform the detailed cleaning on the port side of the bilge. The deck plates were left open for the marine chemist's inspection.

David Capen ("Capen") has been a marine chemist since 1981 and was regularly hired by both Dann Marine and GSR.  Capen arrived to inspect the Boat on Thursday, October 6, 2011 just as

arguments on March 8, 2017.
[7]    From 6:30 a.m. to 5:30 p.m. on Thursday, October 6, 2011. Def.'s Ex. 25.
[8]    There is free communication of liquids in the bilge at the centerline between port and starboard as well as from bow to stern.  Tr. 3, 173:2-14.  The liquids are vacuumed up using a vacuum truck.  Tr. 1, 144:1-2, 21-23.

A2Z was finishing its cleaning.[9]  Collins, signed off on the A2Z

cleaning service, and met with Capen.

Collins described to Capen the scope of work that was

planned for the Boat.[10]  Capen inspected the port fuel oil tank,

the starboard aft fuel oil tank, and the engine room bilge, and

took a number of sensor readings[11] to determine if the atmosphere

was safe for workers and safe for limited hot work.  At about

4:30 p.m. on Thursday, October 6, 2011, Capen issued to Dann

Marine a marine chemist certificate that stated, in pertinent

part:

> Port [Fuel Oil Tank] Aft, [Starboard Fuel
> Oil Tank] Aft, Engine Room > Atmosphere Safe
> for Workers[,] Safe for Limited Hot Work . .
> . .

---

[9]    GSR called to let Capen know when the cleaning company was
expected to finish.  Tr. 1, 157:25-158:3.  It is normal practice
for the cleaning company to remain for the inspection in case
the marine chemist finds areas that require further cleaning.
Tr. 5, 13:23-14:6.

[10]    Capen testified that he was misinformed about the
requirement for hot work inside the engine room and thought that
the hot work would be performed only from the outside. Tr. 1,
154:6-25.  However, Collins testified that he clearly
communicated that the work would be done inside the engine room.
Tr. 3, 13:16-20, 14:8-19.  Also, Capen had served as marine
chemist on the virtually identical work done on the port side of
the Boat. Tr. 3, 18:11-16, 19:20-20:4.  The Court believes
Collins properly communicated the scope of work to Capen.

[11]    Such as levels of oxygen, flammable gases and vapors,
hydrogen sulfide, volatile organic compounds, carbon monoxide,
etc.

Notes

(1) Hot Work Limited to replace rub rail
[Starboard] Side No Closer than 6" of
[Forward Fuel Oil Tank].

(2) Hot Work in Aft [Fuel Oil Tanks]
([Port/Starboard]) repair of vents and
sounding Tubes.

(3) Maintain Fire Watch and Ventilation
during all hot Work

(4) [Shipyard Competent Person[12]] to Recheck
daily prior hot Work.

Pl.'s Ex. 2.

The hot work commenced on the Boat the next morning,
Friday, October 7, 2011. Walter Wise ("Wise"), GSR's shop
supervisor, was designated as the Shipyard Competent Person
("SCP"). He reviewed the hot work certificate to determine the
limitations. Prior to starting the cutting in the engine room,
a fire watch and equipment was set up in the engine room, a fire
blanket was placed to cover the starboard generator at the aft
of the engine room, and Wise performed his SCP inspection and
report and posted the report with the chemist's hot work

---

[12] A "competent person" is required to be designated by a
shipyard to inspect and test the spaces in which hot work is
being performed as often as necessary to ensure that atmospheric
conditions within that space are maintained within the
conditions established by the marine chemist certificate after
the certificate has been issued. 29 C.F.R. §§ 1915.7,15.

8

certificate by the engine room door. Steven Williams

("Williams") began cutting out old steel at the aft of the

engine room and moving forward.  As the old steel was removed by

cutting from the inside, new steel could then be fitted and

welded on from the outside of the Boat by other GSR workers.

At some point later on Friday, Ash drained,[13] dismantled,

and removed the upper part of the starboard fuel manifold to

make room for the cutting to be done on Monday.  The deckhand,

Jones, assisted with the dismantling, and Wise, noting them

struggling with the manifold, helped them lift it up and set it

down on the deck-plate on the port side of the engine room.

Later on, the GSR night-shift covered the open manifold pipes

with rags and tape to keep debris from getting in from their

needle-gunning[14] activities preparing for Monday's cutting.

---

[13]    Ash estimated that approximately three and a half gallons
drained out of the fuel manifold into a five-gallon bucket,
which he moved to the port side of the engine room.  Absorbent
pads were placed below the manifold, on top of a painted wooden
box situated there, and used to collect any potential diesel
leaking during the process.  The used pads were collected and
placed in a garbage container between the two engines in the
middle of the engine room.
[14]    Using a needle-gun to chip off the paint from the area that
will be cut or welded. This is beneficial to reduce smoke and
potential flare-up from the paint on the hull during the
cutting.  Tr. 5, 49:23-50:15, 52:3-10; Tr. 4, 132:21-133:7.

C.  **The Day of the Fire**

Hot work continued on the Boat on Monday, October 10, 2011, starting at about 7:00 a.m.  Wise performed the required SCP inspection and report and posted the report in the envelope with the chemist's hot work certificate by the engine room door.  His inspection included a visual spot check of the bilges as well as the use of a "sniffer"[15] to test $O_2$ (oxygen) and LEL (Lower Explosive Limit)[16] levels to ensure that the area was still safe for hot work.

Wise assigned Subhas Sankar ("Sankar") to be the fire watch and showed him what to do.  Sankar and Williams prepared for cutting by setting up lights, bringing in and draping the cutting torch hoses[17] so they weren't on the deck where they could be tripped over, bringing in a charged garden (water) hose with a squeeze nozzle at the end, and stuffing fire blanket

---

[15]  A portable Combustible Gas and Oxygen Alarm used to sample the atmosphere for combustible gases and vapors.

[16]  "Lower explosive limit (LEL) means the minimum concentration of vapor in air below which propagation of a flame does not occur in the presence of an ignition source." 29 C.F.R. § 1915.11.

[17]  "You have a source of flammable gas. In our case propylene and oxygen combines in the torch, controlled by two valves, ignited with a striker, and adjusted to a cutting flame which you apply to the edge of the steel, bringing it to the heat as required to separate it by pulling the trigger and using an air jet to gouge the preheated steel." Tr. 4, 13:6-11.

pieces in the holes on the ledge[18] under the area where Williams would be cutting.  Sankar was responsible for keeping an eye on the welding on the outside of the engine room as well as Williams' cutting on the inside.

Towards the end of the morning, Wise came by to let Sankar know he was being reassigned after lunch to a different task in the shipyard.  The cutting stopped at about 11:15 to allow 15 minutes for a cooldown before Williams and Sankar left the engine room for their lunch break at around 11:30.  After lunch, Sankar did not return to the engine room but went over to dry dock as he'd been assigned. Williams returned to the engine room to resume work, accompanied by Wise, who took over the fire watch duties from Sankar.  They arrived back at the engine room at around 12:10.

Ash, the Boat engineer, was working on board during the morning and recalls working on paperwork in either his stateroom or the wheelhouse.  He reported taking his lunch break at noon in the Boat's galley.  After his lunch break, Ash went to the engine room to perform some repair work on the starboard generator.  Ash does not recall anyone working in the engine

---

[18]    Horizontal flange plate about six feet above the deck.  Tr. 4, 22:18-21, 23:14-24:10, 31:17-33:5, 65:9-18; also see Ct. Ex. 2.

room while he was on lunch break, but he testified that when he went down in the engine room after lunch to begin working on the starboard generator, he saw a GSR worker cutting in the forward starboard side of the engine room in the area where the fuel manifold had been removed.  Ash Depo. 74, ECF No. 73-1.  Ash does not recall seeing anyone other than Williams in the engine room at that time.

When Wise and Williams arrived in the engine room after lunch, they prepared to start the cutting work again.  Wise spot-checked the bilge by lifting a couple of the bilge plates in the forward engine room.  He checked with a flashlight to see if there was any liquid and found that the bilge was dry.  Wise gave a light spray of water up against the side of the hull to wet it down a little in the area where Williams would be cutting.  Williams plugged the holes in the ledge with fire cloth under the area where he would be cutting, and Wise checked it.  Wise positioned himself in front of the starboard engine where he could also keep an eye on the welding in the aft part of the engine room.

Williams resumed cutting in the starboard forward end of the engine room.  He was crouched on the ledge, which was about six feet above the engine room deck, and he was cutting just

underneath the main deck, which was about eight feet above the engine room deck. Just behind him and slightly aft was the wooden toolbox that was below where the fuel manifold had been removed. Williams had not placed a fire blanket on the painted wooden box because he felt it was in a "safe zone." Tr. 4, 30:14-24.[19] As he continued to cut, Williams felt a heatwave under him, "intense enough to burn the hair out of [his] nostrils." Tr. 4, 34:14-15. He looked down through his burning shield[20] and saw that he was engulfed in flame. He turned off the torch and cast it aside to his right, knocked the shield off with his hardhat, stretched over with one foot to step down on the wooden box and "hit the deck." Tr. 4, 37:17-38:14.

Williams saw Wise spraying water on the fire with the garden hose, but the water seemed to make the fire worse rather than better. Wise dropped the hose, and Williams tried spraying the fire with the garden hose but the flames reacted by intensifying. Wise picked the hose back up and continued spraying water. Believing it must be an oil fire, Williams grabbed one of the Boat's $CO_2$ extinguishers and attempted to put

---

[19]   Nor did Wise put a fire blanket on the box. Tr. 4,111:12-17.
[20]   A full-face, tinted shield that is used during cutting. Tr. 4, 37:13-14. It is attached to the hardhat with a spring mechanism. Tr. 4, 70:18-22.

out the fire by aiming it at the bilge area from which it appeared to him the flames were coming. But, the extinguisher didn't have any effect at putting out the flames. Realizing he wasn't doing any good, Williams threw the extinguisher down and headed for the stairs leading out of the engine room. On the way out, Williams saw Ash who was about to come help him fight the fire with another fire extinguisher. Williams told him to get out too, and they both exited the engine room through the starboard side door. Wise stayed where he was for a few seconds longer still trying to douse the fire with water to no avail. The smoke and heat was escalating quickly, and Wise left the engine room shortly after Williams and Ash, exiting through the starboard aft door.

A call was made to 9-1-1, and fire department equipment was dispatched. Williams was told that he secured the tanks delivering gas and oxygen to the cutting torch, but he does not recall doing it. Ash saw Jones on the dock and asked him to call the Dann Marine office to let them know about the fire. The GSR crew nearby ran fire hoses and began to fight the fire. By 1:30 p.m., the fire department was on the scene, Christian LaPense ("LaPense"), Dann Marine's compliance manager, had left his office in Chesapeake City and was on his way to GSR, and

Derick Lynch was actively helping coordinate with the fire response team.

Foam was required to fight the fire, which was designated a Class B[21] (fueled by combustible liquid) fire. The port generator had been left running, so Ash explained to the firefighters how to turn it off by using the emergency shutoff in the galley. However, the firefighters could not access the shutoff, because it was already under boiling water from the firefighting. Instead, the firefighters went down into the engine room to shut it off according to Ash's instructions. By about 2:00 p.m., the fire was out and the generator secured.

The bilge's electrical submersible pumps stopped working once the generator was shut off. Because the Boat had leaking packing glands,[22] submersible pumps were used to pump overboard any water that collected in the bilge's containment area. With

_____

[21] Fires are classified by the types of fuel they burn. A Class B fire is fueled by flammable or combustible liquids, such as oil, gasoline, and other similar materials. 29 C.F.R. § 1910.155(c)(9). See also Tr. 2, 103:15-105:10(describing sources of combustible fuels to the fire). The most effective way to extinguish a liquid-fueled fire is by inhibiting the chemical chain reaction of the fire by using dry chemical extinguishing agents, CO2, or foam. See Tr. 4, 60:4-25.

[22] Packing glands are designed to keep water from coming into the boat where the propeller shafts go through the hull of the boat, which is under water. Ash Depo. 101:8-18. One of the planned repairs for the Boat was to replace the leaking packing glands with dripless seals. Tr. 2, 206:12-23, Tr. 5, 54:3-13.

15

no electricity to power the pumps, water collected in the bilge, from both the firefighting and the leaking. Dann Marine arranged to have the bilge pumped out by A2Z. In addition to a significant amount of water, about 350 gallons of fuel was pumped out of the bilge after the fire. This fuel may have come from leaking fuel.

After being cleared by the firefighters, Ash returned to the engine room and saw that the sight glass[23] had been damaged and was leaking fuel. Ash turned off the valve, and the sight glass leaking stopped. Ash testified that the leaking sight glass could account for the 350 gallons of fuel that was later pumped out of the bilge. Ash Depo. 60:20-61:1.

Dann Marine's compliance manager, LaPense, arrived at the Boat around 2:45-3:00 p.m. The fire was then out and one of the fire trucks was leaving GSR, but the fire department was still securing the scene. LaPense identified himself to one of the firefighters and received permission to access the Boat and document its condition. At that time, it was still very hot in the engine room, with water dripping, steam, foam, and water-

---

[23] A sight glass is a clear vertical tube, made out of glass or Plexiglas, connected to the day tank, which shows the level of the fuel that is in the tank. There is a 90-degree valve coming off the bottom of the tank to a 90-degree valve at the top of the tank. Ash Depo. 99:5-12.

soaked debris everywhere.  The catwalk and deck around the

engine room was warped and heat-damaged. The mess deck and

galley were severely damaged, and the upper level of the Boat

was smoke-damaged.  LaPense took pictures and coordinated

getting supplies for Ash and Jones and checking them into hotel

rooms. Robert Dann arrived at GSR about an hour after LaPense

and reviewed the Boat's damage along with Derick Lynch.

At some point in the afternoon, the Coast Guard arrived.

Seeing a potential environmental problem with the water and oil

accumulating in the bilge, the Coast Guard directed Derick Lynch

to put the Boat on dry dock the next morning.  However, Robert

Dann instructed Derick Lynch not to put the Boat on the dry dock

and made alternate arrangements to resolve the liquid

accumulation situation.[24]

D.   Post-fire Investigation

GSR and Dann Marine notified their respective insurers, who

dispatched fire investigators the day after the fire, October

11, 2011, to investigate the origin and cause of the fire.

Aaron Redsicker ("Redsicker"), a certified fire investigator

---

[24]   A diver was brought in to wrap plastic around the exterior
of the seals to slow down the water leaking through the packing
glands.

hired by Dann Marine's insurance company, arrived at the Boat on

the morning of October 11, 2011 to begin his investigation.[25]

The Coast Guard[26] and the Baltimore City fire department also

conducted an investigation.

On October 12, 2011, Stephen Murphy ("Murphy"), a marine

surveyor[27] hired by Dann Marine and its insurer, met with Lee

Goldberg ("Goldberg"), the surveyor representing GSR and its

insurer, and LaPense, and did an initial[28] walk-through of the

Boat to assess the extent of damage.  Murphy drafted an initial

report with recommendations, including a recommendation that

qualified diesel mechanics look at the engines to see whether

the fire or the efforts to put out the fire had caused any

damage to the engines.  Soon after, Flag Service and Maintenance

Inc. ("Flag") was dispatched to do an inspection, and they

---

[25]    Redsicker also visited the Boat on October 14, 17, 21, and
28.  An in-house fire investigator from GSR's insurance company
was present at some of the same times.
[26]    As part of the Coast Guard investigation, remains of the
wooden box were tested and found positive for the presence of
ignitable liquids.  Tr. 2, 106:23-107:19.
[27]    A marine surveyor inspects marine vessels such as boats,
barges, tugboats, and fishing vessels, at the request of an
owner, insurance underwriter, law firm, or other interested
party, to provide a valuation or report on the condition of the
vessel.  Tr. 3, 69:21-70:9.
[28]    There were multiple visits to the Boat as part of the
process.

provided an initial estimate to repair the engines and
generators.[29]

GSR requested a joint survey.[30]  Murphy testified that he
believed he was doing a joint survey, but a joint report was
never actually produced.  Murphy testified that he drafted and
signed a survey report and provided it to Goldberg and LaPense
on October 17, 2011, but Goldberg gave it back to him unsigned.

Murphy, Goldberg, and another surveyor[31] returned to the
Boat for a follow-up visit on October 26, 2011.  At that time,
GSR was re-welding the hole on the side of Boat,[32] installing the
rub rail and shell plate, stripping the loose gear that had been
damaged in the fire, and cleaning the Boat in general.  After

---

[29]    An estimate was provided around November 11, 2011 to
overhaul the main engines and generators for about $272,000.00.
Tr. 2, 136:16-137:14; Tr. 3, 125:23-126:8; 147:13-20.   The
estimate included a letter with a disclaimer advising that the
estimate was based on knowledge at that time, and Flag provided
a second estimate months later, after seeing the engines
disassembled, that was more than a million dollars higher.   Tr.
2, 116:2-6; 137:9-14.
[30]    "A joint survey is between the different parties that have
an interest in the claim. I was there on behalf of the hull
underwriters and the owners of the vessel, so it was
my responsibility to actually write up the survey. And then we
would get signatures. Everybody would sign off on it, myself
and the other party."  Murphy, Tr. 3, 77:1-6.
[31]    There were multiple insurers and surveyors involved in the
joint survey efforts.
[32]    GSR completed the side shell repairs and was paid by Dann
Marine for the work performed.

that visit, on November 11, 2011, Murphy sent an email[33] to Goldberg confirming that he had prepared a revised Field Survey Report but was continuing to make further corrections and revisions and would submit a revised draft for review within a couple weeks.  In the November 11 email, Murphy also noted that Robert Dann would be supervising and coordinating all repair operations on board the Boat and that Christopher Dann wanted all future visits to the Boat to be pre-scheduled appointments made through Dann Marine's representative, Murphy.

Murphy visited the Boat again on December 12, 2011. Goldberg learned of the visit and emailed Murphy to question the status of the joint report and to schedule a visit on December 16, 2011 to check on the status of repairs.  Murphy responded on the morning of December 16, 2011, advising that he was waiting to update the Field Survey Report until the full extent of damages were known given that additional damages, such as salt water damages to the engines, were still being uncovered. Murphy suggested that a final joint survey coincide with a visit to the Boat and to Flag Maintenance where the main engine power packs were being taken for inspection and overhaul.  Goldberg

---

[33]    A series of emails, including this, were admitted as Def.'s Ex. 31.

responded an hour later that he planned to stop by the Boat that afternoon for a check-up visit.  However, before he could do so, Cary Lynch advised Goldberg that Claudio Crivici ("Crivici"), who had been retained by GSR to provide a comprehensive damages and repair recommendation, was in contact with Murphy and planning a visit on Monday, December 19, 2011.  Crivici followed up with an email to Goldberg a couple of hours later advising of the plan to meet at the Boat on Monday morning to perform a survey and obtain a signed survey report. Goldberg agreed to attend the joint survey on Monday, December 19, 2011.

Late in the day on Saturday, December 17, 2011, Dann Marine moved the Boat out of the GSR shipyard with GSR equipment still on board,[34] without GSR's knowledge, but with approval from the Coast Guard.  On Sunday, December 18, 2011, Christopher Dann sent an email to Goldberg, Crivici, the Lynches, Murphy, and others stating that no further surveys, visits, or investigations would take place on the Boat unless Dann Marine's insurers expressed the need.

---

[34]    GSR's equipment was later returned to GSR.

Murphy continued to work with Dann Marine's insurance company, reviewing the repairs and commenting on each invoice submitted regarding whether it was claim-related[35] or not.

The heads were pulled from the engines just prior to Murphy's survey at Dann Marine's headquarters in Chesapeake City, Maryland in February 2012. Murphy noted rust spots on the heads as well as the engines. The engines were then fully disassembled and pulled from the Boat and delivered to Marine Systems in Chesapeake, Virginia, where they were inspected by Murphy in May 2012. Murphy suggested to Dann Marine's insurance company that an engine specialist evaluate the engine damages. Murphy went back to Chesapeake, Virginia in July 2012 to inspect the engines with Robert Newman ("Newman"), who had been selected as the engine specialist. Newman provided a report[36] to the insurance company in August 2012. Murphy and Newman were later retained as damages experts by Dann Marine.

---

[35] Deemed claim-related repairs ultimately added up to $$1,280,243.92. On behalf of the insurer, Murphy approved costs as reasonable and identified whether the invoiced amount was wholly reimbursable or betterment, which was not reimbursable, or a combination of the two and partly reimbursable. Engine-related costs were deferred to Newman to assess.

[36] Def.'s Ex. 24.

E.  The Lawsuit

Dann Marine filed the Complaint [ECF No. 1] on May 30, 2012, asserting five counts under admiralty jurisdiction:

- Count I - Breach of Contract,

- Count II - Breach of Implied Warranty of Workmanlike Performance,

- Count III - Negligence,

- Count IV - Gross Negligence, and

- Count V - Breach of Bailment.

GSR answered the Complaint on September 26, 2012, asserting multiple defenses including one stating that the terms and conditions of the contract contain an exculpatory clause that expressly precludes Dann Marine from any recovery of any damages, or in the alternative, limits GSR's liability to the amount of $300,000.00 of actual damages proven at trial. Answer, ECF No. 14. GSR also asserted that Dann Marine's own negligence precluded recovery, it failed to mitigate damages, and that evidence had been spoliated by not allowing proper survey and assessment of damages. Id.

After discovery, on January 13 and 30, 2014, Dann Marine and GSR filed cross-motions for partial summary judgment [ECF Nos. 32, 35] on the enforceability of the exculpatory clause in

GSR's terms and conditions. The Court, by Judge Quarles, issued its decision on July 10, 2014, holding that the exculpatory clause did not limit GSR's liability to Dann Marine but only to third parties. Mem. Opinion 13, ECF No. 38. GSR's motion [ECF No. 32] was denied, and Dann Marine's motion [ECF No. 35] was granted. Id. at 14; Order 1, ECF No. 39.

The five-day bench trial was held June 20-24, 2016, followed by post-trial briefing, and closing arguments were held on March 8, 2017. During closing argument, GSR again raised the exculpatory clause defense and asserted that there were two separate clauses, one of which had not previously been ruled on by Judge Quarles, and contending that Dann Marine was precluded from recovering damages in the event of fire, regardless of negligence or cause. On April 18, 2017, Dann Marine filed Plaintiff's Objection & Motion to Strike [ECF No. 107] GSR's arguments for enforcement of the contractual exculpation of all liability. That motion is also now ripe for decision.

II. DISCUSSION

    A. Breach of Contract

A contract to repair a ship is considered a maritime contract. Kossick v. United Fruit Co., 365 U.S. 731, 735

24

(1961); Sea Land Indus., Inc. v. Gen. Ship Repair Corp., 530 F.
Supp. 550, 556 (D. Md. 1982). "[I]n an admiralty case, a court
applies federal common law and can look to state law in
situations where there is no admiralty rule on point." Ost-
West-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc., 160
F.3d 170, 174 (4th Cir. 1998). Although state law may serve to
supplement federal maritime law, maritime law controls if the
two conflict. Wells v. Libby, 186 F.3d 505, 524-25 (4th Cir.
1999) (quoting Powell v. Offshore Navigation, Inc., 644 F.2d
1063, 1065 n.5 (5th Cir. 1981)). To the extent that state law
is not inconsistent with admiralty principles, "state contract
law may be applicable to maritime contracts." Ham Marine, Inc.
v. Dresser Indus., Inc., 72 F.3d 454, 459 (5th Cir. 1995). Also,
the Uniform Commercial Code ("U.C.C.") is considered a source
for federal admiralty law. See Princess Cruises, Inc. v. General
Elec. Co., 143 F.3d 828, 832 (4th Cir. 1998) (stating that
"U.C.C. principles inform admiralty law").

Under Maryland law, a breach of contract claim requires a
plaintiff to "prove that the defendant owed the plaintiff a
contractual obligation and that the defendant breached that
obligation." Taylor v. NationsBank N.A., 776 A.2d 645, 651 (Md.
2001). The plaintiff need not prove damages resulting from the

breach, because it is well settled that where a breach of contract occurs, one may recover nominal damages even when there is a failure to prove actual damages. Id. (citations omitted). But "[u]nder both tort and contract law, one claiming damages must prove that a tortious act or breach of contract was the proximate cause of the damages claimed." CR-RSC Tower I, LLC v. RSC Tower I, LLC, 56 A.3d 170, 196 n.41 (Md. 2012)(citations omitted).

The parties agree that the contract contained an express provision requiring GSR to provide a fire watch.[37] Dann Marine contends that GSR breached this express provision of the contract by failing to provide the necessary fire watch on the afternoon of October 10, 2011. This contention is primarily based on Ash's testimony that he did not see Wise or any other fire watch on the Boat after the mid-day lunch break.

Dann Marine also cites as additional evidence that there was no warning to Williams about the fire, Williams rather than Wise discharged the CO2 fire extinguisher, and Wise's reported escape route from the engine room is unusual and incredible.

---

[37] "Provide all necessary fire watch during all hot work." Def.'s Ex. 1.

Both Wise and Williams credibly testified that Wise was acting as fire watch on the afternoon of October 10, 2011. The Court accepts that Ash may not have seen Wise even though he was actually there but not visible to Ash. The Court finds that Wise was present on the Boat as fire watch on the afternoon of October 10, 2011.

Accordingly, GSR did not breach the express provision of the contract that required it to provide a fire watch during hot work.


B.    Breach of Implied Warranty of Workmanlike Performance

"[A] contractor in admiralty is to effect ship repairs in a workmanlike manner." Little Beaver Enters. v. Humphreys Rys., Inc., 719 F.2d 75, 77 (4th Cir. 1983)(citations omitted). "Though the implied warranty of workmanlike performance is a legal standard, the question of what is required in a workmanlike performance is necessarily a factual question that naturally varies from case to case based on the scope and nature of the service being undertaken." N. Ins. Co. of N.Y. v. Point Judith Marina, LLC, 579 F.3d 61, 68 (1st Cir. 2009).[38]

---

[38]    There is some disagreement whether the implied warranty continues to be relevant in admiralty law. Compare Little

The implied warranty of workmanlike performance is broad
and has been applied to find fault where repair jobs are not
performed properly and "where efforts intended to prevent damage
to a ship have been ineffective." Little Beaver, 719 F.2d at
77. While the warranty parallels a negligence standard, as
opposed to strict liability, it is not necessary to find that
the repairer was negligent, nor does negligence on the
shipowner's part block the owner from recovering for a breach of
the performance warranty, if the circumstances warrant. Point
Judith Marina, 579 F.3d at 67 (quoting La Esperanza de Puerto
Rico, Inc. v. Perez y Cia. de Puerto Rico, 124 F.3d 10, 17 (1st
Cir. 1997)); see also Parks v. United States, 784 F.2d 20, 26-27

_____

Beaver, 719 F.2d at 80 n.5 ("The warranty of workmanlike service
traces its origins, in the admiralty context, to the United
States Supreme Court decision in Ryan Stevedoring Co. v. Pan-
Atlantic Steamship Corp., 350 U.S. 124 (1956). Its early
applications frequently involved shipowner suits, against
Stevedore companies, seeking indemnity for damages paid to
injured workmen. While its applicability to shipboard personal
injury cases has been statutorily changed by the 1972 amendments
to the Longshoremen's and Harbor Workers' Compensation Act of
1927, 33 U.S.C. §§ 901 et seq., the warranty of workmanlike
service has continued vitality in other areas of admiralty."
(citations omitted)), with David W. Robertson & Michael F.
Sturley, Developments in Admiralty and Maritime Law at the
National Level and in the Fifth and Eleventh Circuits, 35 Tul.
Mar. L.J. 493, 532 (2011)(noting that they have "deplored the
retention by some courts of the concept of an implied warranty
of workmanlike performance," stating that the concept became
obsolete in 1972 and "does no useful work in current maritime
law; it is just potentially confusing clutter.").

(1st Cir. 1986)("The shipowner's negligence does not bar []
indemnity . . . arising from an implied warranty of workmanlike
service . . . . [A]pplication of [the repairer's] indemnity
rests on elements of expertise, control, supervision and ability
to prevent accidents . . . .").[39]  Although some circuits have
apportioned fault in such cases, "the Fourth Circuit has never
embraced a comparative fault approach."  Matter of Robbins Mar.,
Inc., 906 F. Supp. 309, 316 (E.D. Va. 1995); see also Chisholm
v. UHP Projects, Inc., 205 F.3d 731, 734 (4th Cir. 2000)
("Liability for the breach of the warranty of workmanlike
performance arises without fault and appears to approach strict
liability." (citing Salter Marine, Inc. v. Conti Carriers and
Terminals, Inc., 677 F.2d 388, 390 (4th Cir. 1982))).  "A causal
connection must be established between the claimed breach and

---

[39]    But see In re McAllister Towing of Virginia, Inc., No.
CIV.A. 2:00CV36, 2000 WL 1881197, at *9–10 (E.D. Va. July 11,
2000)("[W]hile an implied warranty of workmanlike service exists
in the present case, the warranty will only be breached upon
proof of negligence . . . .").  The McAllister court, however,
makes its ruling specifically with regard to a towage contract,
citing the Fourth Circuit's unpublished decision in Cargill
affirming that "there is no implied warranty of workmanlike
service in a towage contract, at least not one that imposes
liability in the absence of negligent conduct."  Id. at 10
(quoting Cargill, Inc. v. C & P Towing Co. Inc., 943 F.2d 48
(4th Cir. 1991)(unpublished)).

the harm suffered." SS Amazonia v. New Jersey Exp. Marine
Carpenters, Inc., 564 F.2d 5, 10 (2d Cir. 1977).

The warranty does not imply a guarantee of results, and
"the extent of the warranty depends on 'the circumstances of
(the) case relating to control, supervision, and expertise.'"
Tebbs v. Baker-Whiteley Towing Co., 407 F.2d 1055, 1059 (4th
Cir. 1969)(quoting H & H Ship Service Co., v. Weyerhaeuser Line,
382 F.2d 711, 713 (9th Cir. 1967)). If the repairer has
performed with the requisite degree of diligence, attention, and
skill, or if the repairer's efforts "have been hindered by the
actions of the other contracting party, the repair firm will not
be held responsible . . . ." Little Beaver, 719 F.2d at 78.

In the instant case, GSR had a contractual duty to perform
the hot work on the Boat with care and diligence. As well, GSR
had a contractual duty to prevent fire on the Boat during the
hot work by providing the SCP, a fire watch, and taking
appropriate preventive measures. Dann Marine contends that if
Wise was present on the Boat as fire watch, his performance was
deficient – "the functional equivalent of not having a fire
watch." Pl.'s Post-trial Br. 15, ECF No. 90.

The Court finds that the preponderance of the evidence
establishes that Wise, as fire watch, failed to cover or remove

fire hazards, such as the wooden toolbox, with fire blankets, failed to adequately spray the hull to keep it cool, and failed to respond diligently at the first sign of flame. Tr. 4, 37:6-38:22, 75:12-76:6, 111:12-17, Tr. 5, 51:14-52:8. The evidence also establishes that flames and smoke are inevitable in a hot work zone due to hot slag and sparks. Tr.4, 116:24-117:14. The Court finds that Wise failed to use the degree of diligence, attention, and skill adequate to the task of being a fire watch, and, as a result, the inevitable flames were not controlled and the Boat was damaged. Certainly, it is foreseeable that damage could result from a failure adequately to perform fire watch duties in a hot work environment.

GSR asserts that Dann Marine failed to have the Boat properly cleaned for hot work and provided inadequate information to the chemist and argues that such failures relieve GSR of responsibility. However, Dann Marine did not prevent, nor hinder, GSR from doing its duty to inspect or take preventive measures to avoid or minimize fire during hot work. As SCP, Wise had the expertise,[40] the control, and the supervisory duty to ensure the Boat was safe for hot work before

---

[40] Wise was trained and certified as an SCP by the chemist. Tr. 1, 159:11-19.

it commenced, and as fire watch, he had the duty to ensure it remained safe while the hot work was ongoing. Wise failed to take reasonable care to fulfill his duties, and his failure resulted in an uncontrolled fire that damaged the Boat. Any evidence of fault on Dann Marine's part neither relieves GSR of its duty to act competently nor precludes Dann Marine's recovery.[41]

Accordingly, the Court finds that GSR breached the implied warranty of workmanlike performance.


C.    Breach of Bailment

A bailment is

> the relation created through the transfer of
> the possession of goods or chattels, by a
> person called the bailor to a person called
> the bailee, without a transfer of ownership,
> for the accomplishment of a certain purpose,
> whereupon the goods or chattels are to be
> dealt with according to the instructions of
> the bailor.

---

[41]    See Matter of Robbins Mar., Inc., 906 F. Supp. at 315–16 ("shipowner fault must be sufficient to preclude recovery"); Fairmont Shipping Corp. v. Chevron Int'l Oil Co., 511 F.2d 1252, 1260 (2d Cir. 1975) ("But negligence alone will not bar a plaintiff from recovering for breach of warranty of workmanlike performance. 'Merely concurrent fault is not enough'; there must be 'active hindrance.'" (citation omitted)).

Danner v. Int'l Freight Sys. of Washington, LLC, 855 F. Supp. 2d
433, 448 (D. Md. 2012)(quoting Broadview Apts. Co. v. Baughman,
350 A.2d 707, 709 (Md. 1976)).  Under Maryland law, a bailment
consists of the following elements:

(1)  An existing subject-matter;

(2)  A contract with a reference to the subject matter,
     which involves possession of it by the bailee;

(3)  Delivery, actual or constructive; and

(4)  Acceptance, actual or constructive.

Id.

"[A] contract for the storage or repair of a boat
constitutes a bailment agreement."  Commercial Union Ins. Co. v.
Bohemia River Assocs., Ltd., 855 F. Supp. 802, 805 (D. Md.
1991)(citation omitted).  The bailment imposes on the shipyard a
duty of reasonable or ordinary care to avoid loss or damage
during the performance of its contractual duties.  Nat'l Liab. &
Fire Ins. Co. v. R & R Marine, Inc., 756 F.3d 825, 830 (5th Cir.
2014).

Under admiralty law, a rebuttable presumption of negligence
is inferred if the bailor proves that the vessel was delivered
in good condition and was damaged while in the exclusive
possession of the bailee.  Commercial Union, 855 F. Supp. at

805.  The burden then shifts to the defendant, who can rebut the

presumption in two ways:

> (1)     by affirmatively showing defendant's use of
>         reasonable and ordinary care, or
>
> (2)     by proving that the damage was not attributable to
>         the defendant's negligence.

Id.

There is, however, no presumption of negligence inferred if

the bailor cannot establish that the bailee had exclusive

possession and control of the vessel.  Id.; see also Man

Ferrostaal, Inc. v. M/V Akili, 704 F.3d 77, 88 (2d Cir. 2012)

("A bailment does not arise unless delivery to the bailee is

complete and he has exclusive possession of the bailed

property.").

GSR argues that it did not have exclusive possession of the

Boat.  A Dann Marine chief engineer, Ash, and a deckhand, Jones,

stayed aboard the Boat during the time it was at GSR until the

fire.  They performed maintenance repairs, ran a generator to

provide power to the Boat, and removed the fuel manifold to make

room for GSR's hot work.  Additionally, Dann Marine's port

engineer, Collins, directed and inspected the cleaning of the

Boat in preparation for hot work after the Boat arrived at GSR.

Dann Marine contracted with the marine chemist, Capen, and

Collins met with Capen at the Boat to review the scope of work and obtain the Marine Chemist Certificate.

A bailment becomes limited under circumstances where the owner remains or has an agent or employee responsible for the vessel, such that exclusivity of control is compromised.  R & R Marine, 756 F.3d at 831.  However, mere access to the vessel by the bailor or its agents does not affect exclusive possession.  Goudy & Stevens, Inc. v. Cable Marine, Inc., 924 F.2d 16, 19 n.3 (1st Cir. 1991).  "Rather, [exclusive possession] implies that possession and control must be of such a nature as to permit a reasonable trier of fact to infer that the bailee is in the better, or sole, position to explain what actually happened."  Id. at 19; see also Fireman's Fund Am. Ins. Co. v. Captain Fowler's Marina, Inc., 343 F. Supp. 347, 350 (D. Mass. 1971)(holding that the presumption did not apply when neither party had knowledge of the origin of a fire but the cause was ascertained).

In Goudy, the First Circuit affirmed the lower court's finding that, "since both parties had equally unrestricted access to the vessel at all times, there was no basis for an inference of negligence . . . ."  Id.  In R & R Marine, the Fifth Circuit upheld the lower court's finding that the shipyard

35

had full custody of the vessel under circumstances where the shipyard had stipulated to having full custody in the parties' agreement, and the presence of the owner's agents did not create a limited bailment. 756 F.3d at 831.

In the instant case, there was no stipulation in the parties' agreement related to GSR accepting full custody or exclusive control. Rather, Dann Marine specifically retained control over various aspects of the repairs and had employees on board at all times prior to the fire. GSR also argues that Dann Marine's removal of the Boat after the fire without notification to GSR is evidence that GSR never had exclusive control over the Boat. However, the Court does not find Dann Marine's removal of the Boat after the fire relevant to GSR's control prior to the fire.

The Court finds that, under the circumstances herein, only a limited bailment was created. GSR's possession and control over the Boat was not of such a nature as to permit an inference that GSR "is in the better, or sole, position to explain what actually happened." Goudy, 924 F.3d at 19. However, even without any presumption of GSR's negligence, as discussed below, Dann Marine has met its affirmative burden to prove that GSR was negligent.

D.    Negligence

Negligence causes of action in admiralty invoke principles
of maritime negligence, including the doctrine of comparative
negligence. Vollmar v. O.C. Seacrets, Inc., 831 F. Supp. 2d 862,
866 (D. Md. 2011)(citations omitted).  To prevail on a
negligence claim, the plaintiff must prove, by a preponderance
of the evidence, each element of duty, breach, causation, and
damages.  Id.  Further, a ship repairer may be liable under a
negligence theory as well as under the implied warranty of
workmanlike performance.  See, e.g., La Esperanza, 124 F.3d at
16-17 (noting that a ship repairer potentially faces three
sources of liability: breach of an express provision of the
contract; breach of an implied warranty of workmanlike
performance; and the maritime tort of negligence).


1.    Duty

The determination of the defendant's duty is a question of
law for the court.  In re Great Lakes Dredge & Dock Co. LLC, 624
F.3d 201, 211 (5th Cir. 2010).  Generally, a defendant owes the
plaintiff a duty of ordinary care under the circumstances. Id.
To establish the existence and scope of a duty, the court
considers the foreseeability of the harm suffered by the

plaintiff. Id. "In admiralty, a duty of care arises if injury is foreseeable from the alleged negligent action, or if a relationship between the parties imposes it." Commercial Union Ins. Co. v. Bohemia River Assocs., Ltd., 855 F. Supp. 802, 806 (D. Md. 1991) (citing T. Schoenbaum, Admiralty and Maritime Law, sec. 4-2, at 124 (1987)).

As discussed above, the Court finds that GSR had a duty to take reasonable precautions and preventive measures to avoid fire on the Boat while hot work was being performed. It is foreseeable that lack of such care could result in a fire that would damage the Boat.


2.  Breach

The Court finds that the preponderance of evidence establishes that GSR breached its duty to take reasonable precautions and preventive measures to avoid fire on the Boat by failing to remove or cover potential fire hazards in the hot zone with fire blankets, failing to remove or cover the paint chips[42] that had fallen behind the wooden tool cabinet during the needle-gunning in preparation for the hot work, and failing to

_____

[42]    Paint is removed from the steel so it doesn't catch fire during cutting, so if hot slag falls on the paint chips, it is foreseeable that they would catch fire.

adequately spray the hull with water to keep it cool and damp to avoid flare-ups from the hot slag. GSR also failed to respond diligently to the inevitable flames that arise during hot work. For example, the fire watch did not have a fire extinguisher with him as part of his fire-fighting arsenal but only a water hose. Tr. 4, 59:12-25, 38:15-20, 67:2-21, 95:18-22. Williams was not warned about the rising flames by Wise but discovered the fire by feeling a blast of heat that was hot enough to burn his nostrils. Tr. 4, 34:4-17, 37:6-8. If there was flammable or combustible liquid in the bilge as GSR contends, Wise did not discover it in his SCP inspection checks. Tr. 4, 119:3-122:9, 142:13-143:8. The GSR crew also failed to competently follow standard safety regulations[43] such as the 35-foot rule (Tr. 4, 61:23-62:10) and the requirement for a 30-minute cooldown watch

---

[43] "Fire watchers shall be required whenever welding or cutting is performed in locations where . . . [w]all or floor openings within a 35-foot (10.7 m) radius expose combustible material in adjacent areas including concealed spaces in walls or floors. . . . Fire watchers shall have fire extinguishing equipment readily available and be trained in its use. They shall be familiar with facilities for sounding an alarm in the event of a fire. They shall watch for fires in all exposed areas, try to extinguish them only when obviously within the capacity of the equipment available, or otherwise sound the alarm. A fire watch shall be maintained for at least a half hour after completion of welding or cutting operations to detect and extinguish possible smoldering fires." 29 C.F.R. § 1910.252.

(Tr. 4, 63:7-13).  <u>See</u> 29 CFR 1910.251-255 (cutting & welding

safety standards).


3.  <u>Causation</u>

"Under the general maritime law, a party's negligence is

actionable only if it is the 'legal cause' of the plaintiff's

injuries, which is something more than 'but for' causation [—]

the negligence must be a substantial factor in causing the

injuries."  <u>Great Lakes Dredge & Dock</u>, 624 F.3d at 213-14

(alteration in original)(citation omitted).

> "The doctrine of superceding [sic]
> cause is . . . applied where the defendant's
> negligence in fact substantially contributed
> to the plaintiff's injury, but the injury
> was actually brought about by a later cause
> of independent origin that was not
> foreseeable. It is properly applied in
> admiralty cases."  When ruling upon whether
> a defendant's blameworthy act was
> sufficiently related to the resulting harm
> to warrant imposing liability for that harm
> on the defendant, "courts sitting in
> admiralty may draw guidance from, <u>inter
> alia</u>, the extensive body of state law
> applying proximate causation requirements
> and from treatises and other scholarly
> sources."

<u>In re Bay Runner Rentals, Inc.</u>, 113 F. Supp. 2d 795, 804 (D. Md.

2000)(quoting <u>Exxon Co., U.S.A. v. Sofec, Inc.</u>, 517 U.S. 830,

837, 839 (1996)).  "Proximate cause 'involves a conclusion that

someone will be held legally responsible for the consequences of an act or omission.'" Pittway Corp. v. Collins, 973 A.2d 771, 786 (Md. 2009)(quoting Peterson v. Underwood, 264 A.2d 851, 855 (Md. 1970)).

The parties agree that the hot work being performed in the Boat's engine room produced hot slag and sparks that caused the fire. It was certainly foreseeable that a worker using a torch to cut steel in an area with unprotected flammable and combustible materials could produce sparks and hot slag that would start a fire. The parties dispute what combustible material caught fire. GSR contends that it was oil and fuel in the bilge that had not been properly cleaned by Dann Marine. However, the Court finds credible the testimony by Dann Marine's expert; the preponderance of the evidence leads the Court to find that the fire was caused by the ignition of flammable and combustible material, notably paint chips and debris from the needle-gunning activity, behind the unprotected wooden tool cabinet. If the flammable and combustible material had been removed or covered to protect from the inevitable sparks and hot slag, and any flare-ups been immediately dampened, the fire would not have occurred. GSR's failure to take preventive action, combined with its failure to take immediate remedial

action that would have contained the fire, caused the fire to become uncontrolled and cause damage to the Boat.  The fact that certain of Dann Marine's actions and inactions also contributed to the damage does not absolve GSR of responsibility.  The comparative fault of the parties is discussed below.

The Court therefore finds that GSR's negligence is a direct and legally cognizable cause of the fire damage to the Boat.


### 4. Damage

While there are disputes regarding the extent of the Boat's damage, there is no disputing that the Boat was damaged by the fire that occurred on October 10, 2011.  The Court finds it proven that the Boat was damaged and that Dann Marine suffered actual loss as a result of the damage.


### 5. Comparative Fault

More than "a century ago the maritime law exchanged the common law's rule of contributory negligence for one of comparative negligence." Norfolk Shipbuilding & Drydock Corp. v. Garris, 532 U.S. 811, 815 (2001).  In a maritime tort case where more than one party is responsible for the damages caused, the damages are assessed proportionately based on the

comparative degree of each party's fault. <u>See</u> <u>United States v.</u>
<u>Reliable Transfer Co.</u>, 421 U.S. 391, 411 (1975)(applying
comparative negligence principles in a collision context).  In
other words, the plaintiff's degree of fault that caused the
damage reduces the total damage award by that percentage.

GSR contends that Dann Marine took actions that proximately
initially caused the fire as well as exacerbated the damages
resulting from the fire:

- Dann Marine's instruction to A2Z to clean only half
  the bilge resulted in sufficient combustible material
  in the bilge to catch fire from the sparks and hot
  slag;

- Dann Marine's failure to properly describe the scope
  of work to the chemist resulted in an inadequate
  inspection;

- Dann Marine's failures to remove the wooden tool
  cabinet from the engine room, to secure the valve to
  the day tank sight glass, and to cap the ends of the
  fuel oil manifold after removing it, resulted in the
  provision of fuel to the fire which caused the fire to
  spread and caused more damage than otherwise would
  have occurred.

As discussed above, the Court finds that the fire was
initially caused by hot slag and sparks igniting combustible or
flammable material behind the wooden tool cabinet.  The weight
of evidence does not support GSR's theory that the fire was
caused by hot slag and sparks igniting fuel that was in the

bilge because it was inadequately cleaned.  Even if it may have
been negligent to clean only the starboard half of the bilge,
this did not cause the fire.  There is no evidence that there
was flammable or combustible fuel in the bilge sufficient to
start a fire.  In fact, the chemist's initial inspection and the
SCP's inspections and meter readings confirmed that the bilge
was adequately clean for hot work in the engine room.  Further,
there was no evidence of heat damage to the port side of the
engine room, which is the side of the Boat that GSR claims was
inadequately cleaned.

The Court does not credit Capen's testimony that he was
misinformed regarding the scope of hot work and finds that the
chemist's inspection and certificate was sufficient for the hot
work envisioned.  Furthermore, if an additional inspection and
certificate was required after removal of the fuel manifold as
GSR contends, the Court finds that it was GSR's responsibility
to request the inspection[44] since the SCP was in the best
position to be aware of the change in the engine room's
condition vis-à-vis safety precautions for hot work.  The Court
also finds that it was GSR's responsibility to either remove or

---

[44]    Either directly or by asking Dann Marine to schedule an
inspection.

cover potential fire hazards in the engine room that were at risk of being hit by hot slag and sparks from the hot work.

Accordingly, the Court does not find that Dann Marine's actions proximately caused the initial fire. However, the Court does find that Dann Marine shares some responsibility for the fire's spread, which caused increased damage to the Boat. Dann Marine removed the fuel manifold on the weekend prior to the fire to make room for Williams to cut on Monday. Although there was no sign of dripping from the pipes, there was evidence after the fire that the pipes had been damaged and were leaking fuel. Tr. 2, 107:11-13, 107:24-108:1. The Court finds that it was negligent for Dann Marine's chief engineer not to lock off the fuel running to the pipes on the starboard side of the engine room where the fuel manifold had been removed and not to cap the open pipes after removal. Additionally, there is evidence that the sight glass lower valve was left in an open rather than closed position. Ash Depo. 60-61, 99-100. The sight glass became damaged in the fire and was leaking fuel, and this fuel also fed the fire once started.

Upon consideration of all of the evidence, the Court finds that Dann Marine bears responsibility for 10% of the Boat's damage caused by the fire.

E.  Gross Negligence

Courts sitting in admiralty consider comparable state law
in identifying the standard for gross negligence.  See Royal
Ins. Co. of Am. v. Sw. Marine, 194 F.3d 1009, 1015 (9th Cir.
1999) (reviewing admiralty standard for gross negligence and
citing to admiralty cases, state law, and Black's Law
Dictionary).  Maryland law recognizes that it is difficult to
distinguish between gross negligence and negligence.  Barbre v.
Pope, 935 A.2d 699, 717 (Md. 2007).  Maryland courts define
gross negligence

> "as something more than simple negligence,
> and likely more akin to reckless conduct;"
> gross negligence is an intentional failure
> to perform a manifest duty in reckless
> disregard of the consequences as affecting
> the life or property of another, and also
> implies a thoughtless disregard of the
> consequences without the exertion of any
> effort to avoid them.

Id. (quoting Taylor v. Harford County Dep't of Soc. Servs., 862
A.2d 1026, 1035 (Md. 2004)).  The Fourth Circuit has noted that
"wanton and reckless conduct, also described as gross
negligence, is a failure to use even a slight degree of care."
Hurd v. United States, 34 F. App'x 77 (4th Cir. 2002)(citing
Martin J. Norris, The Law of Maritime Personal Injuries, 9.4
(4th ed. 1990)).

46

Dann Marine argues that GSR's failure to take proper precautions during hot work constitutes gross negligence, citing a 1931 Louisiana case that so held. Pl.'s Post-trial Br. 17, ECF No. 90 (citing United States v. Todd Eng'g Dry Dock & Repair, 53 F.2d 1025 (E.D. La. 1931). In that case, the court found that the repairmen took "no precautions" prior to commencing hot work in the vessel's boiler room that was littered with flammable debris, and there was no fire watch while the torch was being used. Todd Eng'g, 53 F.2d at 1031 (emphasis added).

The circumstances in the instant case are not the same as in Todd Eng'g and do not constitute intentional failure nor reckless disregard of the consequences. Here, there was a fire watch present during hot work, and the SCP performed inspections prior to the commencement of hot work. Although the Court has found that GSR was negligent, it does not find that negligence to rise to the level of gross negligence.

F.   Damages

In this case, Dann Marine seeks recovery of damages by virtue of its successful contentions that GSR breached the implied warranty of workmanlike performance and that the

47

negligence of GSR caused it damages.  A recovery on a negligence claim, unlike recovery on the implied warranty claim, is subject to reduction to take into account any plaintiff negligence that contributed to the amount of damage.

In the instant case, Dann Marine chose to repair the Boat to a condition better than it had prior to the fire.  Hence, the damage award herein is limited to the pre-fire fair market value of the Boat.

"In maritime law, when a vessel is damaged, 'the owner is entitled to its money equivalent, and thereby to put in as good a position pecuniarily as if his property had not been destroyed.'" F.C. Wheat Mar. Corp. v. United States, 712 F. Supp. 2d 471, 473 (E.D. Va. 2010), aff'd, 663 F.3d 714 (4th Cir. 2011)(quoting Standard Oil Co. v. Southern Pac. Co., 268 U.S. 146, 155 (1925)).  The general rule for calculation of damages in admiralty cases requires restoring the vessel owner to the same position that it would have been in before the damage occurred – "restitutio in integrum"[45] – and in the event of a total loss, either actual or constructive, the measure of

---

[45]    "Restoration to the previous condition or the status quo." Black's Law Dictionary (10th ed. 2014).

damages is the market value of the property just before the

loss.  The Baltimore, 75 U.S. 377, 385–86 (1869).

> The workable guides to this end,
> generally stated, are these. If the ship
> sinks and is beyond recovery, the damages
> are her value just before she sank, plus
> interest thereon until payment. If she is
> not a complete loss and repossession or
> repairs are both physically and economically
> feasible, then the reasonable cost of
> recovery, including repairs and an allowance
> for deprivation of use, is the measure. But
> if the reclamation expense including repairs
> exceeds the ship's just value at the time of
> the casualty, or if repairs are not both
> physically and economically practicable,
> then it is a constructive total loss, and
> the limit of compensation is the value plus
> interest.

Hewlett v. Barge Bertie, 418 F.2d 654, 657 (4th Cir. 1969)

(citation omitted).

The underlying rationale in breach-of-contract actions is

to place the vessel owner, as innocent party, in the position

that it would have been in had the contract been fully

performed.  Todd Shipyards Corp. v. Turbine Serv., Inc., 467 F.

Supp. 1257, 1304–06 (E.D. La. 1978), aff'd in part, modified in

part and rev'd in part, 674 F.2d 401 (5th Cir. 1982).  "Contract

damages are awarded to give the injured party the benefit of the

bargain."  In re Newport Offshore, Ltd., 155 B.R. 616, 620

(Bankr. D.R.I. 1993), subsequently aff'd sub nom. Ondine Shipping Corp. v. Cataldo, 24 F.3d 353 (1st Cir. 1994).

In addition to these guiding principles for calculating damages, the Court is mindful that "a federal court sitting in admiralty is not tied to any strict rules of the common law, but has the authority to make equitable decisions, considering all of the facts and circumstances of the individual case." BP Expl. & Oil, Inc. v. Moran Mid-Atl. Corp., 147 F. Supp. 2d 333, 341 (D.N.J. 2001) (collecting cases).

### 1.   Repair Costs

Limited by the pre-fire value of the Boat, Dann Marine, as the damaged vessel's owner, is entitled to recover the reasonable cost of repairs necessary to restore the vessel to its pre-damaged condition, as well as fees and expenses related to the repair work that were incurred by the owner. Turecamo Mar., Inc. v. Weeks Dredge No. 516, 872 F. Supp. 1215, 1232–33 (S.D.N.Y. 1994)(citations omitted). It is the plaintiff's burden to prove the amount of damages to a "reasonable certainty" and that the damage was the result of defendant's fault. Id. (citing Pinto v. M/S Fernwood, 507 F.2d 1327 (1st Cir. 1974)).

Dann Marine submitted detailed evidence and testimony by Christopher Dann, Stephen Murphy, and Robert Newman to support its position that the total cost of reimbursable repairs was $2,526,976.14.[46]

Total actual expenditures incurred by Dann Marine to fix the Boat as it wished – to a somewhat better condition than it had prior to the fire - were more than $3.2 million.[47]  Pl.'s Ex. 10.  The difference between total expenditures and the amount claimed reflects Dann Marine's decision to repower rather than

---

[46]    The total comprises power-related repairs of $1,246,732.22 and other repair costs of $1,280,243.92.  Dann Marine noted in closing arguments that it had made a mistake in its brief, which indicated that the total was $2,619,046.98, and clarified that the total cost of repairs should be $2,526,976.14, which includes power-related repairs of $1,246,732.22 and other repairs of $1,280,243.92. See Tr. 6, 107:24-108:3.  The record reflects that Murphy testified about an additional claim-related expense of $92,070.84 that was added to his report by addendum. Tr. 3, 122:1-123:2.  The resulting updated total other expense, therefore, was $1,372,314.76, id., which added to the engine repairs totaled $2,619,046.98.  It is unclear from the record whether line item 161 for the Smith invoice had been added to the earlier total in a slightly different amount of $173,400.58. See colloquy regarding arithmetical error, Tr. 3:117:7-123:2. The Court accepts the modified number of $1,280,243.92 as accurately submitted for other repairs.
[47]    Dann Marine received reimbursement from insurance for $2,450,000.00 after spending $3,228,390.17 on repairs and repair-related expenses.  Tr. 3, 59:2-15; Pl.'s Ex. 10.

repair the engines and some reductions for the betterments[48] obtained. Tr. 3, 59:22-61:11, 89:5-90:4.

### a.   Power-related Repairs

Newman was retained[49] by Dann Marine to provide an expert opinion on the reasonable cost of repairs, and the value of, the two main engines, the generators, and the marine transmissions on the Boat.  Dann Marine made a decision to repower rather than repair, so Newman based his repair estimate on repair quotes provided after inspection of the damaged engines, transmissions, and generators.

Flag provided an engine-repair quotation of $1,354,791.28 in 2012 after the engines had been removed from the Boat,

---

[48]   The absence of damages for betterment costs avoids giving the injured party a windfall by providing a new replacement for something that was old and depreciated and would have had to be replaced anyway.  See, e.g., Pillsbury Co. v. Midland Enters., Inc., 715 F. Supp. 738, 764 (E.D. La. 1989), aff'd and remanded, 904 F.2d 317 (5th Cir. 1990)("[W]here repair or replacement costs form the basis of the damage award, the Court must determine whether the repair or replacement adds new value to or extends the useful life of the property; if so, an appropriate reduction from the full repair or replacement costs should be made.").
[49]   Newman had originally provided a damage report on the engines for one of the insurance companies. Tr. 2, 122:2-124:11; Def.'s Ex. 24.

disassembled and inspected.[50] Newman discounted Flag's quote to allow for the engines' condition at the time of the fire, which were not in a newly-overhauled state.  Because Dann Marine maintained the engines on a running overhaul basis, Newman derived[51] an average age of the engines' 16 power packs and crankshaft at four years.  Newman opined that such engines would normally have a 15-year life, which would mean they had 11 years of life remaining, so he reduced the quoted amount to 70%,[52] for an estimate of $948,353.90.

Marine Specialties quoted about $236,000.00[53] to repair the marine transmissions, and there was a quote of about $23,000.00[54] to repair the generators. In total, Newman's damages valuation of the engines, transmissions, and generators is $1,246,732.22. GSR's expert opined that the engines could have been repaired to their pre-fire condition for much less than Newman's estimate

---

[50]    Flag had provided a proposal in November 2011 after its initial inspection, subject to modification upon further inspection, to overhaul the main engines and generators for about $272,000.00. Tr. 3, 125:23-126:4, .

[51]    Newman explains his methodology in Tr. 2, 116:2-120:4.

[52]    11 years of life remaining divided by 15 years of expected life represents 73%, which Newman rounded down to 70%.

[53]    Tr. 2, 120:14-21.  The exact amount is not on the record. The transmission had a rubber, bladder-type clutch and a planetary gear set that had to be replaced after the fire.  Tr. 2, 147:19-148:2.

[54]    Tr. 2, 120:22-23.  The exact amount is not on the record.

and suggests that a better valuation is a fair market value pre-fire of less than $200,000.00.

In cases such as this one in which repairs are not actually made, the "estimated cost of repairs at a time immediately following the accident" is a proper measure of damages. Yarmouth Sea Prods. Ltd. v. Scully, 131 F.3d 389, 399 (4th Cir. 1997)(quoting United States v. Shipowners & Merchants Tugboat, 103 F. Supp. 152, 153 (N.D. Cal. 1952), aff'd, 205 F.2d 352 (9th Cir.)).[55] Here, the repair estimate immediately following the accident was Flag's estimate to repair the engines and generators for about $272,000.00. However, in a December email, Murphy indicated that damage was still being discovered, noting that Flag was still evaluating engine damages and planned to take the engine power packs to their shop. Def.'s Ex. 31. There is no evidence on record of any earlier estimate or quote for repair of the transmissions.

The Court finds Newman's and Murphy's testimony credible. However, based on the evidence that is in the record, the Court cannot find sufficient support for the total of $1,246,732.22

---

[55]    Where repairs are not made, damages may also be measured by the diminution in the market value of the vessel. Yarmouth, 131 F.3d at 399.  Neither party has provided evidence to support such a measure.

for power-related repair expenses. The Court accepts Newman's valuation of $948,353.90 for engine repairs. There is no detail to support the transmission and generator quotes. There is no evidence regarding the condition of the transmission or generators pre-fire, nor any sound way to evaluate the cost of the damage caused by the fire in comparison. Therefore, the Court finds that Dann Marine has not proven cost of repairs related to the transmission and generators.

"[O]nce a plaintiff proves its damages, a defendant has the burden to show the damages award should be limited because the plaintiff failed to take reasonable measures to mitigate its loss." VICI Racing, LLC v. T-Mobile USA, Inc., 763 F.3d 273, 300 (3d Cir. 2014); see also Nat'l Liab. & Fire Ins. Co. v. R & R Marine, Inc., 756 F.3d 825, 832 (5th Cir. 2014). Recovery for damages will be reduced to the extent that defendant proves that damages are enhanced by the plaintiff's unreasonable failure to mitigate. Tidewater Marine, Inc. v. Sanco Int'l, Inc., 113 F. Supp. 2d 987, 1004 (E.D. La. 2000).

GSR contends that Dann Marine failed to mitigate the damage to the engines, a failure which significantly increased the cost of repairs. GSR points to the million dollar difference between Flag's original estimate and the estimate eight months later and

attributes the difference to the accumulation of rust because of failure to mitigate. GSR's expert, Crivici, opined that the engines could have, and should have, been "pickled"[56] to preserve and protect them at a cost of around $2,000.00.

Newman's original report for the insurer also included comments related to mitigation efforts that should have been taken:

> If these engines had been carefully flushed with fresh water and Diesel fuel, and then misted with lubricating oil after the fire they could have been saved to operate in the pre-fire condition.
>
> After removal of the power packs, and before removal of the engines from the tugboat, the engines were not properly covered. The result of this lack of care or oversight resulted in rusted crankshaft connecting rod journals. These crankshafts would have been useable in their pre fire condition if they had been protected from the dripping water.

Def.'s Ex. 24.

On October 12, 2011, the day after the fire, Murphy had recommended that Dann Marine have qualified diesel mechanics inspect the engines for damage. Tr. 3, 124:1-5. Flag performed their initial inspection in November 2011, but after the initial

---

[56] Opened up, flushed with fresh water and diesel fuel, and then oil-misted to protect them from rust. Tr. 5, 167:19-169:15; Tr. 2, 154:10-21; Tr. 3, 129:4:9; Def.'s Ex. 24.

estimate was prepared, it was discovered that the damage was more extensive than originally believed.  The actual disassembly and detailed inspection was not performed until months later, and no remedial measures were taken during that time.

Newman testified that the mitigation efforts would have had to be taken immediately because rust starts to develop on steel immediately. Tr. 2, 154:2-155:1.  Newman estimated that, under the circumstances after the fire on the Boat, it would take two people about eight hours just to clean the area sufficiently to open the engine up to begin mitigation efforts.  Tr. 2, 151:18-21.  He added that it would be necessary to have the engines flushed with water within four hours, and that the effort it would take to do a proper mitigation job was not feasible.  Tr. 2, 152:22-24.  Newman also testified that if the rust had been mitigated, it would have reduced the cost of overhauling the engines by 10 or 15 per cent, if it could have been done.  Tr. 2, 137:25-138:10.

The evidence establishes that Dann Marine failed to mitigate damage to the Boat's engines.  Even if immediate mitigation could not have been feasibly undertaken to prevent further damage to the engines, Newman testified that some of the damage was the result of the engines not being properly covered

after the power packs had been removed, resulting in rusted crankshafts. It was also clear that Dann Marine was aware as early as December 2011 that water had worked its way into some of the cylinders and had been sitting there since the date of the fire. There was no excuse for Dann Marine's failure to take mitigating action that could have lessened the cost to overhaul the engines.

Accordingly, the Court finds that Dann Marine failed to take appropriate mitigation efforts and shall reduce the engine-related cost of repair amount by 15%, the percentage opined by Newman to be a reasonable reduction for the mitigation failure. Accordingly, the Court finds that the power-related costs of repair are $806,100.82.

### b.   Other Repairs

Murphy was responsible to the insurer for determining the reasonable cost of repairs and which repairs were attributable to the fire versus betterment.[57]  He was also hired as Dann

---

[57]   For example, the galley deck was partially rusted around the sink prior to the fire.  There was also warping damage to the galley deck from the fire.  Murphy prorated the total invoice of $68,000.00 for that repair to be $55,000.00 claim-related to cover the warping damage from the fire and $13,000.00 as vessel betterment for repairing the rusting problem around

Marine's expert to provide a report on reasonable repair costs
as well as the Boat's pre-fire valuation. Murphy provided a
detailed spreadsheet identifying each line item cost with
allocations related to betterment. Pl.'s Ex. 11.

GSR contends that some repairs should be depreciated
further than Murphy allowed. For example, GSR's expert opines
that the paneling replaced in the galley should be depreciated
by 50%. However, Murphy explained credibly that the paneling
had to be replaced because of the fire damage in the insulation,
and the paneling selected was a reasonable replacement. Because
it is new, it may appear to be an upgrade, but it was an
unavoidable expense because of the fire damage. GSR also argues
that the entire Boat did not need to be rewired, so some of the
rewiring costs are betterment. However, Murphy explained that
the engine room had to be rewired because of fire damage, which
required reconnecting the wiring to the controls in the
wheelhouse even though the wheelhouse itself may not have
suffered fire damage. Further, some electrical wiring expenses
were deemed to be upgrades rather than claim-related. See,
e.g., Tr. 3, 116:15-18 (testifying that line item 165 for
electrical wiring in the amount of $23,353 was not claim-related
the sink. Tr. 3, 111:7-17.

but an upgrade).  The Court finds Murphy credible and accepts his opinion that the costs were reasonably allocated with regards to betterment.

Although GSR asserts that Dann Marine failed to mitigate the engine damage, it has made no contentions regarding failure to mitigate other damages.

The Court is satisfied that Dann Marine has met its burden to prove that the "other" repair costs of $1,280,243.92 were reasonable and were related to the fire damage with appropriate reductions having been made for betterment.  GSR has not met its burden to show that the claimed damages are unreasonable or unrecoverable.

### c.    Summary Cost of Repairs

The Court finds that the total cost of repairs proven by Dann Marine is $2,086,344.74, comprised of $806,100.82 for power-related repairs and $1,280,243.92 for other repairs.

### 2.    Fair Market Value

A vessel is considered a constructive total loss when the cost of repairs exceeds its value just before the damage occurred.  F.C. Wheat, 712 F. Supp. 2d at 473 (citing Standard

<u>Oil</u>, 268 U.S. at 155–56).  In that event, the limit of
compensation is the vessel's fair market value at the time of
injury plus interest, and there is no recovery for loss of use.
<u>Id.</u> (citations omitted).

The plaintiff establishes a <u>prima</u> <u>facie</u> case with proof of
repair costs.  <u>Tidewater Marine</u>, 113 F. Supp. 2d at 1005 (citing
<u>O'Brien Bros. v. The Helen B. Moran</u>, 160 F.2d 502, 505 (2nd Cir.
1947)).  The defendant may then provide evidence suggesting that
the total value of the vessel is less than the cost of repairs.
<u>Id.</u>  Then, "the plaintiff must rebut that evidence with proof of
a higher market value, or else recovery may be limited." <u>Id.</u>

As a general rule, market value is established by evidence
of contemporaneous sales of like vessels. <u>Standard Oil Co. v.</u>
<u>Southern Pac. Co.</u>, 268 U.S. 146, 155–56 (1925). However, a court
may establish market value by other means as long as its
judgment is reasonable. <u>See id.</u> at 156 ("The ascertainment of
value is not controlled by artificial rules. It is not a matter
of formulas, but there must be a reasonable judgment having its
basis in a proper consideration of all relevant facts.").

If no established market exists for the damaged property, a
court may consider other evidence to determine the value of the
property, including replacement cost, expert opinion of marine

surveyors, the use value to the owner, depreciation, insured

valued, and other established rules of damages. See, e.g.,

Hewlett, 418 F.2d at 658; U.S. Fire Ins. Co. v. Allied Towing

Corp., 966 F.2d 820, 826 (4th Cir. 1992); see also F.C. Wheat,

663 F.3d at 722 (recognizing that a court may value a vessel for

which a market value is not ascertainable by relying upon any

number of methodologies, including the vessel's replacement cost

depreciated).

### a. GSR's Valuation

GSR's expert, Crivici, opined that the maximum property

damages should be the fair market value of the Boat "at $600,000

less $75,000, plus or minus $25,000 credited for her residual

post-fire value . . . ." Tr. 5, 133:20-23, 188:3-5.[58] Crivici

assessed the condition of the Boat pre-fire and compared it to

actual sales of comparable vessels in 2011 and 2014,[59] namely,

the tugs JOHN MARSHALL, the EVELYN CUTLER, the OSG SEAFARER, and

the OSG LIBERTY.

---

[58]    There is nothing on the record that clarifies what the
reduction of $75,000.00 relates to.
[59]    Crivici opined that the 2014 market, if anything, was
slightly better than the 2011 market.  Tr. 5, 186:2-4, 195:2-16.

Crivici opined that the closest comparable vessel was a tug a few years newer than the Boat named the JOHN MARSHALL, referring to her as having almost identical dimensions, the same engines, and the same horse power.  The JOHN MARSHALL's 2014 survey provided an estimated fair market value of $1,040,000.00, and sold for $750,000.00 in October 2014.  Crivici testified that it was a sale between a willing buyer and a willing seller without duress, although the buyer was a Canadian company who would not be in direct competition with the seller. Tr. 5, 197:6-199:22.

The EVELYN CUTLER, a larger vessel with bigger engines than the Boat, sold for more than a million dollars.  Tr. 5, 210:2-12.  She underwent a capital restoration in 2004, and under a prior name was laid up for two years before being sold as a non-working vessel. Tr. 5, 211:4-9, 212:5-15.  There was no evidence regarding the year in which the EVELYN CUTLER was sold.

According to reports from a broker, Marcon Tug Sales, the OSG SEAFARER and OSG LIBERTY were sold in 2011 to a Nigerian company for $2.5 million, or $1.25 million each.  At the time of sale, the vessels were not operating, and the sale may have been part of a liquidation in a bankruptcy proceeding.  Tr. 5, 206:9-

19, 207:5-23.  The actual sale values may have been less than the broker reported to Crivici.  Tr. 5, 206:21-22, 207:9-208:13.

Finally GSR introduced evidence regarding an offer for sale of the Boat by Dann Marine to Vane Brothers in 2003-2004.  Tr. 5, 75:20-76:2. Dann Marine offered the Boat for about $2-2.2 million, but Vane Brothers declined to purchase the Boat at that price.  Tr. 5, 76:3-12.  Vane Brothers apparently wished to sell off its older tugs and was buying newer, and it sold a tug named the PATRIOT, which was said to be similar to the Boat, to a Mexican company for $979,000.00 in October 2009.  Tr. 5, 77:6-11, 78:17-79:3, 79:23-80:7, 83:5-84:15, 84:19-85:6.  Vane Brothers sold another tug, the CHARLES BURTON, testified to be similar but smaller than the Boat, and have smaller engines, to a Maine company for about $650,000.00 in about 2011.  Tr. 5, 85:14-86:23.

### b.  Dann Marine's Valuation

Dann Marine's expert, Murphy, opined that the market value of the Boat pre-fire was between $2.5 million to $2.8 million. Tr. 3, 91:22-92:6.  Murphy testified that he used three different valuation methods – two to calculate and one as a check.  Tr. 3, 98:16-21.

Murphy began his valuation by determining the replacement value of the Boat, which he testified was $6 million.  Tr. 3, 92:17-93:8.  Murphy then estimated that the Boat had a useful lifespan of 75 years, and depreciated the $6 million over the 75 years.  Tr. 3, 92:9-19.  Since the Boat was 44 years old on the day of the fire, the value on that day was about $2.5 million.  Tr. 3, 93:19-22.

Murphy then checked brokerage listings for the used tug market, which had a broad range from $1.5 million to $3.5 million.  Tr. 3, 94:3-14.  Murphy opined that the used tugboat market is not an accurate representation of the value of working tugboats because often the sellers are under duress, so they are not actually "willing sellers."  Tr. 3, 94:12-95:2, 145:3-21, 149:6-11.  Marcon broker's website had eight vessels listed with asking prices.  Tr. 3, 144:12-145:2.  Murphy did not follow up to determine whether the vessels sold or for what price, but the 2011 Marcon broker report indicated that tugboats were selling for 93.03 percent of their listing price.  Tr. 3, 145:25-146:4, Tr. 5, 213:1-13.

Murphy also calculated a valuation for the Boat using the income approach.  Tr. 3, 95:12-15.  Murphy used the average charter rate for Dann Marine's equivalent tugboats for 2011-12

and calculated the value of the Boat to Dann Marine based on the
derived annual profits over 20 years discounted for present
value.  Tr. 3, 96:17-19, 97:3-25.  Using three different
discount rates yielded valuations of $3.65 million at four
percent, $3.0 million at five percent, and $2.67 million at six
percent.  Tr. 3, 98:6-11.  Murphy testified that this
calculation validated his earlier valuations using the other two
methods, but also that he thought it was the most appropriate
under the circumstances since the Boat was productive.  Tr. 3,
98:12-21, 131:19-133:2.

Additionally as to value, the evidence established that the
vessel was insured for $2.45 million.  Tr. 3, 59:2-6.


c.    The Boat's Valuation

Based on the testimony provided by both parties' experts,
the Court agrees that looking only at United States tugboat
sales may not provide the most accurate representation of the
Boat's value.  Only one of the actual sales testified to by
GSR's expert occurred in 2011, providing insufficient market
evidence to be persuasive.  Further, the 2011 listing prices
testified to by Dann Marine's expert, assuming a sales price at
93 percent of listing, provides a range of $1.395 million to

$3.255 million, which only provides some evidence regarding the outside limits of reasonable valuation. However, the evidence does not provide the Court with any adequate evidence of contemporaneous sales of comparable vessels.

The Court has considered other valuation methodologies, such as the depreciated replacement cost ($2.5 million), the earning capacity ($2.67 million), and the insured value ($2.45 million). GSR's evidence of Dann Marine's offer to sell the Boat for over $2 million may provide some indication of the Boat's stated value to its owner at that time, but the timeframe of that offer (2003-2004) reduces its relevancy for determining a 2011 valuation. Considering all of the relevant facts, the Court finds that GSR's valuation of $600,000.00 is not reasonable, being lower than any of the actual sales testified to, including the only 2011 sale of two non-working boats sold as a package at $2.5 million.

The Court finds that depreciated replacement cost provides one of the more reasonable approaches in this case. The parties agree that it would cost $6 million to build a new tugboat. GSR's expert also agreed that a 75-year lifespan is not unreasonable for a tugboat provided it is well maintained. There is sufficient evidence to find that Dann Marine regularly

maintained its fleet, and specifically implemented a running overhaul maintenance schedule on the Boat's engines. Christopher Dann testified that 9 of Dann Marine's 20 tugboats are a similar age as the Boat and are in running order earning money for the company. Tr. 3, 37:23-38:8. Even were the Court to assume that a more reasonable lifespan for the Boat is 65 years, the depreciated replacement cost of the Boat would be about $2 million. This is less than its insured value and certainly within a value determined by reference to its earning capacity using the income approach.

Accordingly, the Court finds that the evidence reasonably establishes the pre-fire value of the Boat to be $2 million, an amount somewhat lower than the damage award that would result from the repair cost method. Hence, the Court shall limit the damage award to $2,000,000.00.


### 3. Loss of Use

In order to recover lost profits in a maritime case, "the plaintiff must present proof sufficient to bring the issue outside the realm of conjecture, speculation or opinion unfounded on definite facts." Cargill, Inc. v. Taylor Towing Serv., Inc., 642 F.2d 239, 241 (8th Cir. 1981)(citations

omitted); _see also_ Cent. State Transit & Leasing Corp. v. Jones
Boat Yard, Inc., 206 F.3d 1373, 1376 (11th Cir. 2000)("There
must be a pecuniary loss, or at least a reasonable certainty of
pecuniary loss, and not a mere inconvenience arising from an
inability to use the vessel. . . ." (quoting The Conqueror, 166
U.S. 110, 133 (1897))); ConAgra, Inc. v. Inland River Towing
Co., 252 F.3d 979, 983 (8th Cir. 2001).

An appropriate measure is "the amount the vessel would have
earned in the business in which she has been customarily
employed." Turecamo, 872 F. Supp. at 1233 (quoting Moore-
McCormack Lines, Inc. v. The Esso Camden, 244 F.2d 198, 201 (2d
Cir. 1957)). "While plaintiffs' damages must be proven with
'reasonable certainty,' mathematical precision is not required
and reasonable approximations will suffice." Great Lakes Bus.
Tr. v. M/T ORANGE SUN, 855 F. Supp. 2d 131, 148-49 (S.D.N.Y.
2012), aff'd, 523 F. App'x 780 (2d Cir. 2013)(citing Story
Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563
(1931)).


a.   Lost Profits Amount

Christopher Dann testified that Dann Marine lost profits of
$428,187.50 as a result of the fire.  The Boat was taken out of

69

service for the scheduled repairs at GSR, but because of the fire, it could not go back into service as planned and had to be replaced with another boat from Dann Marine's fleet. Tr. 3, 40:1-41:7. The Boat was actually out of service for more than three years, but Christopher Dann calculated lost profits on the basis of one year, which he deemed a reasonable approximation for how long the repairs ideally should have taken. Tr. 3, 41:21-42:13.

To derive the lost profits, Christopher Dann began by taking the average daily rates that all of Dann Marine's 3000-horspower class vessels were earning, which was $5,115.00 per day. Tr. 3, 43:2-5. Then, for the same class of vessels, he determined that each vessel had an average utilization rate of 86 percent, based on the average downtime while the vessels were not earning any revenue - 61.4 days in 2011, 41.79 days in 2012, representing a combined average of 51.6 down days per year per vessel. Tr. 3, 43:6-12. Christopher Dann then applied that utilization rate to the average daily revenue to derive gross revenue of $1,605,598.50.[60] See Pl.'s Ex. 9, Tr. 3, 46:19-47:2.

---

[60] $5,115.00 average daily rate x 365 days x 86% = $1,605,598.50.

To derive expenses, Christopher Dann took the Boat's actual expenses from January 1, 2011 until the day before the fire, and annualized them assuming the boat continued to work for the rest of the year. Pl.'s Ex. 9, Tr. 3, 43:21-46:13.[61] The derived total expenses were $1,177,411.00, which was then subtracted from the projected revenue for a net profit of $428,187.50. Pl.'s Ex. 9, Tr. 3, 47:3-5. When the Boat was put back in service, it went back on charter earning $5,800.00 per day. Tr. 3, 61:12-19.

GSR argues that Dann Marine may not recover lost profits because Christopher Dann's testimony was unsupported by any evidence. Christopher Dann testified that GSR did not receive documentation to support the actual expenses, the down-time, nor the income figures used to calculate the average daily rate. Tr. 3, 63:23-65:1. GSR also asserts that there is no evidence to substantiate a single charter that Dann Marine was forced to reject because its fleet had been reduced by one boat. However,

---

[61] Necessarily, some expenses, such as insurance, were already known for the year so did not need to be annualized. Tr. 3, 45:18-46:4, 49:25-56:5. Payroll costs were calculated by taking actual payroll from October 11, 2011 to December 31, 2011, ($19,961.16) subtracted from the actual for the year ($512,198.00), and then dividing it by 283 days (representing January 1, 2011 to October 10, 2011) to get a true daily crew cost of $1,739.00 per day x 365 days = $634,735.00. Pl.'s Ex. 9, Tr. 3, 44:4-45:15.

Dann Marine's burden is not as onerous as GSR would have the Court require. See, e.g., Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc., 747 F.2d 995, 1001 (5th Cir. 1984), on reh'g, 753 F.2d 378 (5th Cir. 1985)("To require the vessel owner to prove that specific cargos were not carried because of the casualty would be unsound for several reasons . . . . it would impose an onerous burden not called for in this type of case."(citation omitted)).

Certainly, any award of lost profits necessarily includes some element of speculation. However, Christopher Dann's testimony was credible, included a reasonable calculation of the Boat's expenses, and utilization and revenue based on sister vessels, and was sufficient to convince the Court that profits may reasonably be supposed to have been lost.

Accordingly, the Court finds that Dann Marine has satisfied its burden to show lost profits of $428,187.50. The lost profits, however, are not awardable to Dann Marine for two reasons because, as discussed above, the cost of repairs exceeded the fair market valuation of the Boat, so loss of use damages are unavailable, and as discussed below, consequential damages in the absence of gross negligence, are limited by the parties' contract.

b.   <u>Consequential Damages Limitation</u>

The contract between the parties states, in pertinent part,

> In no event shall [GSR] be liable for any
> consequential damage including, but without
> limitation . . . loss of revenue . . . or
> loss of use.

Def.'s Ex. 1.  GSR argues that it "is not liable for any

consequential damages, including, but not limited to, Dann

Marine's claim for loss of use."  Proposed Joint Pretrial Order

17, ECF No. 68.

During closing argument, Dann Marine's counsel agreed that

the consequential damages limitation is a valid part of the

contract, which would preclude Dann Marine from recovering for

loss of use unless the Court were to find GSR liable for gross

negligence.  Tr. 6, 120:8-25.  As discussed above, the Court

does not find that GSR's negligence rose to the level of gross

negligence.  Therefore, the contract's consequential damages

limitation applies, and Dann Marine may not recover any loss-of-

use damages.

4.   <u>Pre-judgment Interest</u>

Under maritime law, an award of prejudgment interest is

"the rule rather than the exception, and, in practice, is well-

nigh automatic." U.S. Fire Ins. Co. v. Allied Towing Corp., 966
F.2d 820, 828 (4th Cir. 1992) (quoting Reeled Tubing, Inc. v.
M/V Chad G, 794 F.2d 1026, 1029 (5th Cir. 1986)).  The
underlying purpose for presumptively awarding prejudgment
interest is to "ensure that an injured party is fully
compensated for its loss." City of Milwaukee v. Cement Div.,
Nat'l Gypsum Co., 515 U.S. 189, 195 (1995).  Of course, there
may be exceptional or extraordinary circumstances which militate
against an award of prejudgment interest.  Id. at 196.  It is
within the court's discretion to determine whether or not such
circumstances exist, as well as when interest begins and the
interest rate to be awarded.  Id. at 196; Ameejee Valleejee &
Sons v. M/V Victoria U., 661 F.2d 310, 313–14 (4th Cir. 1981);
Indep. Bulk Transp., Inc. v. Vessel Morania Abaco, 676 F.2d 23,
25 (2d Cir. 1982).

There is no dispute regarding whether there should be an
award of pre-judgment interest in this case, i.e., no
exceptional circumstances militate against such an award.  Dann
Marine requests that the interest rate be set at Maryland's
common law rate of six percent per annum, compounded annually,
to commence on the date of loss.  GSR argues that any pre-
judgment interest awarded should be assessed in accordance with

28 U.S.C. § 1961(a),[62] at a rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System.  GSR also argues that any award of pre-judgment interest should not begin to run from the date of the fire, but rather from the date the repairs to the Boat were completed.

a.    Interest Rate

The period in question herein is a period during which the Maryland common law rate (6% per annum simple interest)[63] was substantially in excess of market rates.[64]  Dann Marine's suggestion that the Court should use this rate and, in addition, compound interest annually, is beyond the range of reasonable. Moreover, Dann Marine has presented nothing to support the contention that GSR having the use of Dann Marine's money would

---

[62]    The federal statute regarding the award of interest on judgments is 28 U.S.C. § 1961, which, by its terms, is silent on the award of pre-judgment interest.

[63]    Md. Const. Art. III, § 57 ("The Legal Rate of Interest shall be Six per cent. per annum; unless otherwise provided by the General Assembly.").

[64]    The long-term composite rate published by the United States Treasury for October 11, 2011 was 2.80%, and annually thereafter: 2012 – 2.42%, 2013 – 3.44%, 2014 – 2.79%, 2015 – 2.68%, 2016 – 2.28%.  See https://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=longtermrate.

have resulted in a gain to GSR or loss to Dann Marine at a rate at all near the 6% common law rate. Yet, the rates proposed by GSR also do not appear appropriate.[65] Given that § 1961 does not expressly govern an award of pre-judgment interest, the Court does not believe that the § 1961 rate of interest would be an applicable pre-judgment interest rate in this case.

Because the record does not refute GSR's contention that the Maryland rate was much higher than the true value of the funds in question during the period at issue, the Court shall award prejudgment interest at one-half the Maryland common law rate, 3% per annum, simple interest. This rate is reasonable compared to commercial rates and appropriate to compensate Dann Marine for the loss of use of money during the pendency of this case.

### b. Date Interest Commences

"Prejudgment interest is typically awarded from the date of the loss." World Fuel Servs. Trading, DMCC v. M/V HEBEI SHIJIAZHUANG, 12 F. Supp. 3d 810, 813 (E.D. Va. 2014). The Court finds it appropriate to exercise its discretion and

---

[65] GSR's proposed one-year rates are significantly lower than the long-term composite rate. See https://www.federalreserve.gov/releases/h15/.

commence the running of prejudgment interest on the date of the loss, _i.e._, October 10, 2011.

### 5.   Attorneys' Fees

"[T]he 'American Rule' [provides] that, at least absent express statutory authorization [or enforceable contractual commitment] to the contrary, each party to a lawsuit ordinarily shall bear its own attorney's fees."  <u>City of Riverside v. Rivera</u>, 477 U.S. 561, 567 (1986)(citing <u>Alyeska Pipeline Service Co. v. Wilderness Society</u>, 421 U.S. 240 (1975)); <u>see also Fleischmann Distilling Corp. v. Maier Brewing Co.</u>, 386 U.S. 714, 717 (1967)("[A]ttorney's fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor.").  Limited exceptions have developed when overriding considerations of justice compelled such a result.  <u>See Fleischmann</u>, 386 U.S. at 718 (citing <u>Vaughan v. Atkinson</u>, 369 U.S. 527 (1962), which held that an admiralty plaintiff may be awarded counsel fees); <u>Whorton v. Home Ins. Co.</u>, 724 F.2d 427, 431 (4th Cir. 1984) ("In the absence of a statute or special agreement allowing recovery of attorneys' fees, a losing party may be assessed such fees only when it has acted in bad faith or for oppressive reasons.").

Dann Marine seeks to rely on a Fifth Circuit case, Todd Shipyards Corp. v. Auto Transp., S.A., 763 F.2d 745, 751 (5th Cir. 1985), which states: "It is well established in this circuit that, in an action for breach of implied warranties of workmanlike performance, attorney's fees are recoverable as foreseeable damages."  Dann Marine's reliance is misplaced.

First, the seminal case in the Fifth Circuit related to the recoverability of attorneys' fees in an action involving the warranty of workmanlike performance is Strachan Shipping Co. v. Koninklyke Nederlandsche Stoomboot Maalschappy, N.V., 324 F.2d 746 (5th Cir. 1963), cert. denied, 376 U.S. 954 (1964).  In Strachan, the court permitted a defendant and third party plaintiff shipowner to recover as indemnity from the third party defendant stevedore, as items of damages, its attorneys' fees incurred in defending against the plaintiff longshoreman's claim.  See id. at 746-47.  It did not extend a right to attorneys' fees in prosecuting its claim against the breaching party.  Id. at 747.

Second, other binding Fifth Circuit cases either state the rule clearly, or imply by their facts, that there is only an indemnitor-indemnitee exception to the general admiralty rule against awarding attorneys' fees.  See, e.g., Platoro Ltd., Inc.

v. Unidentified Remains of a Vessel, 695 F.2d 893, 906 n. 19

(5th Cir.), cert. denied, 464 U.S. 818 (1983); Noritake, Inc. v.

M/V HELLENIC CHAMPION, 627 F.2d 724 (5th Cir. 1980); Brock v.

Coral Drilling, Inc., 477 F.2d 211, 217 (5th Cir. 1973); Lusich

v. Bloomfield Steamship Co., 355 F.2d 770, 776 (5th Cir. 1966).

Finally, the Fourth Circuit also recognizes an indemnity

exception to the general rule against awarding attorneys' fees.

Old Dominion Stevedoring Corp. v. Polskie Linie Oceaniczne, 386

F.2d 193, 198 (4th Cir. 1967); Am. Exp. Lines v. Norfolk

Shipbuilding & Drydock Corp., 336 F.2d 525, 527 (4th Cir. 1964).

The instant case, however, is not an indemnity case, nor are

there any other exceptions to the general rule that apply.

Accordingly, Dann Marine is not entitled to recover its

attorneys' fees.


G.    Exculpatory Clause

The contract between the parties included two exculpatory

clauses:

> [GSR] shall not be liable for any
> damages or delays caused by strikes, labor
> difficulties or disturbances, fires, theft,
> accidents of any nature, with or without
> negligence on our part, except as
> hereinafter provided, Acts of God,

restraints of Government, delays in delivery
of materials, or any other causes. . . .

. . . .

Should any provision of this contract
exempting us from liability be declared or
adjusted to be invalid, the Customer agrees
that in no event shall our aggregate
liability for all parties whether the
Customer or others exceed the sum of
$300,000.00 with respect to or arising out
of any one vessel in event of claim, suit or
other action by third parties.  Customer
agrees to hold us harmless for any amount
above this sum, including, if necessary,
payment of said excess amount to said third
parties.

Def.'s Ex. 1, ¶¶ 3, 6.

In the Answer [ECF No. 14] to Dann Marine's Complaint [ECF
No. 1], GSR included as a Second Affirmative Defense:

General Ship Repair performed its work
on plaintiff's vessel pursuant to a binding
contract the terms and conditions of which
expressly preclude plaintiff from any
recovery of any [of] the damages which
plaintiff claims herein, or in the
alternative, limits General Ship Repair's
liability to the amount of $300,000.00 of
any actual damage suffered and proven at
trial, and which terms and conditions
specifically exclude any recovery for any
alleged economic damages, such as loss of
use, loss of profits or other consequential
damages.  A copy of General Ship Repair's
terms and conditions, which are expressly
incorporated into the contract between
Plaintiff and General Ship Repair, are
annexed hereto as GSR Exhibit "A".

Answer ¶ 31, ECF No. 14.

Dann Marine and GSR filed cross-motions for partial summary judgment [ECF Nos. 32, 35] on the enforceability of the exculpatory clause in GSR's terms and conditions. GSR requested that its liability, if any, be limited to $300,000.00. Mot. Mem. 8, ECF No. 32. This Court denied GSR's motion because the related clause did not limit GSR's liability to Dann Marine but only to third parties. Mem. Opinion 14, ECF No. 38. In its cross-motion, Dann Marine requested that the Court dismiss GSR's Second Affirmative Defense and deny GSR's motion for partial summary judgment. Cross-Mot. 12, ECF No. 35. This Court granted Dann Marine's motion. Mem. Opinion 13, ECF No. 38.

In its post-trial brief and in closing argument, GSR argued that the Court's analysis regarding the exculpatory clause was limited to the red letter clause limiting liability to $300,000.00, and stated that "[t]his Court should find that GSR is liable for no damages at all as a result of this provision." Def.'s Post-trial Br. 46, ECF No. 95; Tr. 6, 121:11-125:22. GSR references a footnote in Judge Quarles' opinion [ECF No. 38], which states:

> The referenced terms and conditions
> contain two red letter clauses, one which
> disclaims all liability and the other which

> limits its liability to $300,000. Although
> GSR references both clauses, it makes no
> argument to support the enforceability of the
> former clause, and, in its conclusion,
> requests that the Court grant its motion
> "limited its liability, if any, to $300,000."

Id. at 4, n.3 (citations omitted).

Dann Marine contends that the Court's granting of its motion to dismiss GSR's Second Affirmative Defense is the law of the case, Judge Quarles specifically analyzed the unenforceability of the first clause, and GSR waived the defense by failing to raise it pre-trial.[66] The Court agrees.

By granting Dann Marine's motion, this Court held that GSR's Second Affirmative Defense was dismissed with regard to the two exculpatory clauses discussed in the opinion. Judge Quarles explicitly stated:

> In ship repair contracts, courts will
> enforce a red letter clause if it: (1) is
> "expressed freely," (2) is "entered into
> freely by parties of equal bargaining
> power," and (3) does "not provide for a
> total absolution of liability."

---

[66] Further, Dann Marine argues that GSR conceded that the first clause was unenforceable in its response to Dann Marine's cross-motion: "The contract then goes on to recite that [GSR] shall not have any liability for 'damage or delay' caused by, inter alia, fires. The exculpatory clause is unequivocal and unconditional, and is applicable to all parties, including, foremost, the Customer, Dann Marine. Recognizing that such an absolute and unconditional exculpation clause may not be enforceable under case law . . . ." Reply 3, ECF No. 36.

Mem. Opinion 7, ECF No. 38 (citations omitted).  To the extent

that there is any ambiguity to Judge Quarles' decision, the

Court now holds that the exculpatory clause at issue is not

enforceable because it provides for a total absolution of

liability.  See, e.g., La Esperanza de P.R., Inc. v. Perez y

Cia. de Puerto Rico, Inc., 124 F.3d 10, 19 (1st Cir.

1997)("[C]ourts today will enforce red letter clauses that are

expressed clearly in contracts entered into freely by parties of

equal bargaining power, provided that the clause not provide for

a total absolution of liability."); Edward Leasing Corp. v.

Uhlig & Assocs., Inc., 785 F.2d 877, 888 (11th Cir. 1986)(citing

cases holding that where parties to repair contracts may validly

stipulate that the repairer's liability is to be limited, the

cases did not allow for total absolution of liability).  The

Court declines GSR's invitation to follow the Ninth Circuit's

rationale in Royal Ins. Co. of Am. v. Sw. Marine, 194 F.3d 1009,

1014 (9th Cir. 1999) which concluded that "except in towing

contracts, exculpatory clauses are enforceable even when they

completely absolve parties from liability for negligence."

Finally, because GSR did not raise this legal issue until

after trial, its contention has been waived.  See McLean

Contracting Co. v. Waterman Steamship Corp., 277 F.3d 477, 480

(4th Cir. 2002) ("Failure to identify a legal issue worthy of trial in the pretrial conference or pretrial order waives the party's right to have that issue tried."). The only limitation issue that GSR raised in the pretrial order was consequential damages. Proposed Joint Pretrial Order 17, ECF No. 68.

GSR included a brief comment in its closing brief, and during closing arguments, GSR's counsel asserted that GSR was not liable for any damages whatsoever based on the exculpatory clause. As a result, Dann Marine filed Plaintiff's Objection & Motion to Strike [ECF No. 107], requesting the Court to strike GSR's arguments directed at enforcing contractual exculpation of all liability and to affirm Judge Quarles' summary judgment opinion as the law of the case. The Court shall grant Dann Marine's motion.

III. <u>CONCLUSION</u>

For the foregoing reasons:

    1.   Count I – Breach of Contract

        a.   The Court finds General Ship Repair Corp. not liable for express breach of contract.

    2.   Count II – Breach of Implied Warranty of Workmanlike Performance

     a.    The Court finds General Ship Repair Corp.
          liable for breach of implied warranty of
          workmanlike performance.

     b.    The Court awards Dann Marine Towing, LC
          damages of $2,000,000.00 with prejudgment
          interest at the rate of 3% simple interest
          per year commencing October 10, 2011.

3.    Count III – Negligence

     a.    The Court finds General Ship Repair Corp.
          liable for negligence.

     b.    The Court finds that Dann Marine Towing, LC
          bears comparative fault of 10%.

     c.    The Court awards Dann Marine Towing, LC no
          damages for negligence in addition to those
          awarded with regard to Plaintiff's claims in
          Count II.

4.    Count IV – Gross Negligence

     a.    The Court finds General Ship Repair Corp.
          not liable for gross negligence.

5.    Count V – Breach of Bailment

     a.    The Court finds General Ship Repair Corp.
          not liable for breach of bailment.

6.    The Court grants Plaintiff's Objection & Motion
     to Strike [ECF No. 107].

7.    Judgment shall be entered by separate Order.

8.    Dann Marine Towing, LC may file a motion seeking
     an award of assessable costs within fourteen days
     of the entry of Judgment.

     a.    Pursuant to Rule 109.2.a. of the Rules of
          the United States District Court for the
          District of Maryland ("Local Rules"),

Plaintiff may defer filing the memorandum required by Local Rule 109.2.b. until 35 days after filing the motion or, if an appeal is taken from the Judgment, within fourteen days of the issuance of the mandate of the appellate court.

b. General Ship Repair Corp. shall file any opposition to the said motion within fourteen days of the service of the Rule 109.2.b. memorandum.

SO DECIDED, on <u>Thursday, September 7, 2017</u>.

_____/s/_____ _____
Marvin J. Garbis
United States District Judge